# France Petition

*Joseph K. Pierce,* for petitioners.
*James Reynolds,* for respondents.

DOWLING, *J.,* August 15, 1977—The joy which the proponents of Harrisburg experienced when the Commonwealth agreed to construct state office buildings in this area, was not shared by various property owners in the uptown section of Harrisburg who had been led to believe that it was into

their neighborhood that the seat of government would extend its physical plant with all the concomitant benefits. Although an action for breach of promise is no longer permissible in Pennsylvania, the rejected suitors have come to court via the Eminent Domain Code alleging that certain conduct and actions have in fact resulted in a taking of their property.

A certain historical setting is helpful in appraising the lawsuits. The Planning Commission of the City of Harrisburg, by resolution adopted in November, 1965, declared the area in the City of Harrisburg bounded by Forster Street, Third Street, Reily Street and Sixth Street as being blighted. During this time, and perhaps earlier, the City, its Redevelopment Authority, the Bureau of Community Development of the Department of Commerce of the Commonwealth of Pennsylvania (later the Department of Community Affairs), and the Department of Property and Supplies of the Commonwealth (later the Department of General Services), became jointly interested in developing the area bounded by Forster Street, Third Street, Verbeke Street and Sixth Street as an urban renewal project, with the Commonwealth to take title to and develop the land area south of Herr Street as an extension of the State Capitol grounds (referred to as Capitol Park Extension Area). Correspondence and preliminary actions led to the execution by the aforementioned parties in November, 1968, of an agreement for developing the location. The Authority applied to the Commonwealth of Pennsylvania for a redevelopment assistance grant and to the Housing and Home Finance Administrator (Federal) for survey and planning funds (under Title I of the Housing

Act of 1949). The Authority caused the properties in the Capitol Park Extension area to be appraised but did not negotiate for or purchase any of them. The Commonwealth did not proceed with redevelopment plans, eventually lost interest in the project and as a result thereof the Authority did not file for federal funds (Part I of the Loan & Grant Application) to purchase the properties. There was considerable newspaper publicity to the effect that the general area was declared blighted; that it was contemplated that the State would acquire and develop the lands south of Herr Street; that the Authority has been authorized to apply for Federal and State Funds; and that a public hearing would be held concerning acquisition of properties.

Mattie France and other persons named as property owners in the Harrisburg City area bounded by Forster Street, Third Street, Herr Street and Sixth Street on October 30, 1975, filed a petition for the appointment of viewers (1268 September Term 1975) claiming that there had been a de facto taking of their properties as the result of acts and actions of the Redevelopment Authority of the City of Harrisburg (Authority) and the Commonwealth of Pennsylvania, Department of General Services (Commonwealth.)

On the same date, Reverend Belgium and Augusta Baxter, husband and wife, and Anna P. Brown, single person, alleging ownership of properties in the Capitol Park Extension area filed a petition for the appointment of viewers (1269 September Term 1975) on behalf of themselves and "all other property owners within the Capitol Park Extension area similarly affected" claiming in similar language a de facto taking of their properties.

Preliminary objections were timely filed by the Commonwealth and by the Authority. In general, those of the Authority object to the joining of property owners and the "class action" technique used in the second petition; allege that the condition of petitioners' properties did not result from actions of the Authority but is due to the general deteriorating economic condition in the area and that the facts as alleged do not show a de facto taking within the meaning of the Eminent Domain Code or that petitioners are entitled to damages. The Commonwealth raises the additional objection that there had been a misjoinder of it as a condemnor. Evidentiary hearings were held on February 28, 1977, and March 31, 1977.

We first address ourselves to the threshhold procedural problems. The petitions are based on section 502(e) of the Eminent Domain Code of June 22, 1964, P. L. (Spec. Sess.) 84, as amended, 26 P. S. § 1-502(e) which provides: "If there has been a compensable injury suffered and no declaration of taking therefor has been filed, a condemnee may file a petition for the appointment of viewers substantially in the form provided for in subsection (a) of this section, setting forth such injury."[1]

---

1. "(a). The condemnee may file a petition requesting the appointment of viewers, setting forth:

"(1) A caption which shall be the caption of the proceeding substantially as set forth in the declaration of taking, with an identification of the petitioner and his property. The petitioner shall be designated as the plaintiff. Except as otherwise ordered by the court, the viewers' proceedings shall be at the same court term and number as the declaration of taking.

"(2) The date of the filing of the declaration of taking and whether any preliminary objections thereto have been filed and remain undisposed of.

"(3) The name of the condemnor.

"(4) The names and addresses of all condemnees and

It is apparent that this section is not explicit on the question of whether or not more than one landowner may join in filing the petition although it is clear from § 507 that, where more than one party has an interest in condemned property, the claims of all such parties shall be heard together.[2] We feel, however, that this problem has been resolved by the Commonwealth Court in Condemnation E. Bersshire Street, 20 Pa. Commonwealth Ct. 601, 343 A.2d 67 (1975), where multiple condemnees who owned separate parcels in fee claimed damages as a result of a single act of condemnation affecting all their parcels. The court noted that section 502(g)[3] vests in the lower courts discretion to order separate viewers' proceedings in the furtherance of convenience, or to avoid prejudice

mortgagees known to the petitioner to have an interest in his property and the nature of their interests.

"(5) A brief description of his property which may include any or all of his properties in the same county taken, injured or destroyed for the same purpose by the condemnor, whether by the same or separate declarations or without a declaration of taking.

"(6) A request for the appointment of viewers to ascertain just compensation."

2. Section 507 (a).

"The claims of all the owners of the condemned property, including joint tenants, tenants in common, life tenants, remaindermen, owners of easements, or ground rents, and all others having an interest in the property, and the claims of all tenants, if any, of the property, shall be heard or tried together and the award of the viewers or the verdict on appeal from the viewers shall first fix the total amount of damages for the property, and second, apportion the total amount of damages between or among the several claimants entitled thereto."

3. Section 502 (g).

"The court, in furtherance of convenience or to avoid prejudice, may on its own motion or on motion of any party, order separate viewers' proceedings or trial when more than one property has been included in the petition."

when more than one property has been included in a single petition, and thus concluded: "The Code therein implicitly recognizes that separate properties may be included in a single petition. . ." at page 605.

This does not, however, solve the issue raised by the petition of Reverend Baxter, et al., brought on behalf of the three named individuals and "as representatives of all other property owners similarly affected" which is, in effect, a class action. It has been held that the Pennsylvania Rules of Civil Procedure do not govern civil proceedings under the Eminent Domain Code. Dept. Transportation v. Ambrosia, 24 Pa. Commonwealth Ct. 8, 11, 354 A.2d 257 (1976): "[W]e believe that, until such time as the Supreme Court sees fit to do so, the Eminent Domain Code continues to provide the exclusive procedure by which eminent domain matters are governed." There is nothing in the Eminent Domain Code which would suggest that a class action is permissible. Actually there are provisions to the contrary. See section 402 in reference to declaration of taking, and section 502 in reference to petitions for the appointment of viewers. A reading of the Code discloses that the overall intent was for a full disclosure and indicates that viewers are to be given one property at a time. All of this negates any form of class action. Furthermore, a class action requires rules of procedure for its implementation. Also, by their very nature, eminent domain proceedings are essentially in rem proceedings against specific properties. Accordingly, we will confine our attention to the interest of named petitioners and exclude the class action from consideration.

The position of the Commonwealth of Pennsylvania as a joint condemnor is predicated on the allegation in the petitions that the Authority and the Commonwealth acted in concert as agent and principal. The justification for joinder under the Code, even if the burden of proving this relationship is met, is troublesome for, by its terms, it makes no provision for joint condemnors or joint compensation. The definition of "condemnor" in section 201(3) of the Code is "the acquiring agency, including the Commonwealth of Pennsylvania, taking, injuring or destroying private property under authority of law for a public purpose." By the literal definition of agency, the only qualifying entity under the petitions would be the Redevelopment Authority. The area was fixed by that agency after a certification of blight; the application for funds was made by the agency; notices were sent by that agency; contracts for appraisers and appraisals were made by that agency, and public hearings were conducted by that agency.

The Commonwealth was not the acquiring agency in this case because "under authority of law" would only apply to the General State Authority under Act 451 of August 14, 1963, P. L. 1032, 71 P. S. § 1707.4, or to the Redevelopment Authority. The Commonwealth was never authorized to acquire petitioners' land, as was evidenced by several witnesses. The petition and the evidence fail to indicate any act of legislature whereby the Commonwealth was authorized to acquire any land in the area fixed by the Redevelopment Authority.

Petitioners base their agency claim upon the agreement of November 22, 1968, which is the

only written authorization for the Redevelopment Authority to act for or on behalf of the Commonwealth. A reading of this instrument in its entirety does not establish that it is an agency contract but rather an agreement to cooperate in sharing the expenses for planning and surveying the proposed project. The most that the Commonwealth could be designated from this agreement would be as a "Redeveloper"; although normally that designation arises from a contract to purchase land already acquired by the Redevelopment Authority and to "redevelop" or improve it. There is no evidence of such a contract.

The Redevelopment Cooperation Law of May 24, 1945, P. L. 982, is no panacea under the circumstances of this case. Section 4 thereof, 35 P. S. § 1744, specifies legal ways in which the Commonwealth or state public body may help a redevelopment project. Section 6.1 thereof added by Act of January 19, 1968 (1967 Sess.), P. L. 987, requires a written agreement approved by the municipality to designate the Redevelopment Authority as agent for the Commonwealth or to delegate its lawful activities and programs to such Redevelopment Authority.

The concerted action theory lacks validity. The Commonwealth expressed interest but other than sharing in expenses and planning, made no real commitment, such as a redevelopment proposal or contract as in sections 10 and 11 of the Urban Redevelopment Law of May 24, 1945, P. L. 991, 35 P. S. §§ 1710, 1711. The actual commitment was made in the Harrisburg area. What petitioners thought about the Commonwealth's intent, active part and interest is not what counts. It is what the Commonwealth did and executed that determines

the relationship with the Redevelopment respondent. The November 22, 1968, agreement is as far as it went and it did not travel into the realm of agency. The singleness of purpose in the venture is emphasized by the fact that the Commonwealth reserved the right to terminate the agreement after the Authority applied for federal funds to carry out the project. For these reasons we, therefore, dismiss the Commonwealth as a respondent and limit our further consideration to the Redevelopment Authority of the City of Harrisburg.

We now turn to the substantive issue of whether the remaining respondent committed acts sufficient to constitute a de facto taking. This has been left by the Code for the courts to determine. Initially we should point out that the issue was raised by preliminary objections and that these are not the typical procedural devices to test the soundness of pleadings. Although not expressly provided by the Code, they have been sanctioned as the appropriate procedure to test the legal sufficiency of petitions for the appointment of viewers filed by property owners alleging a de facto "taking": Commonwealth's Crosstown Exp. Appeal, 3 Pa. Commonwealth Ct. 1, 281 A.2d 909 (1971). Thus, they are not in the nature of a demurrer under which well pleaded facts are admitted as true. As stated in Jacobs v. Nether Providence Twp., 6 Pa. Commonwealth Ct. 594, 297 A.2d 550 (1972): "The role of preliminary objections to a formal declaration of taking in eminent domain cases as prescribed by Section 406 of the Eminent Domain Code, 26 P. S. § 1-406, and as construed by the Supreme Court and this Court is not precisely that of preliminary objections as prescribed by the Pennsylvania Rules of Civil Procedure in actions

covered by those rules. In eminent domain cases, they serve a somewhat broader purpose and are intended as a procedure to resolve expeditiously threshold legal issues without awaiting further proceedings before viewers and possibly a jury trial on appeal from a viewer's report. In directing the court to determine promptly all preliminary objections, to make such orders as necessary, including a final order, and to take evidence by deposition or otherwise if issues of fact are raised, the provisions of Section 406 manifest a legislative intent to have such matters judicially determined prior to further proceedings, therby avoiding what might prove to be the unecessary expenditure of considerable amounts of money and time incident to proceedings before viewers and to a jury trial on appeal from a viewer's report. McConnell Appeal, 428 Pa. 270 236 A.2d 796 (1968); Golden Dawn Shops, Inc. v. Philadelphia Redevelopment Authority, 3 Pa. Commonwealth Ct. 314, 282 A.2d 395 (1971).

"Having sanctioned the use of preliminary objections as the appropriate procedure to test the legal sufficiency of a petition for the appointment of viewers alleging a de facto 'taking' or compensable injury (Crosstown, supra), we are of the opinion that the role of such preliminary objections should be of the same scope and serve the same purpose as that assigned to preliminary objections to a formal declaration of taking."

It is therefore apparent that the burden is upon petitioner to present evidence and facts upon which the court can make a legal conclusion that a de facto taking has indeed occurred.

A good starting ground for the judicial declara-

tion on this point is Commonwealth's Crosstown Exp. Appeal, supra, where, after noting that: "Under exceptional circumstances it has been held in Pennsylvania and elsewhere that governmental action demonstrating an intention to effect a public improvement and acting thereon in a manner demonstrating commitment to completion of the improvement amounts to a taking in a constitutional sense even though there had been no physical taking of the property alleged to have been injured" the court stated: "However, the case law and treatise writers are far from a unanimous view of what action constitutes such a compensable injury without entry or physical intrusion. Snitzer in his treatise has termed such taking an 'inverse condemnation.' 'For want of a more precise definition, an inverse condemnation occurs when the courts hold that the effect of the governmental action complained of is tantamount to the 'destruction, injury or damage' of private property for which just compensation must be paid, even though no formal condemnation proceedings have been institued [Section 502(e) enables an affected owner to petition for viewers to secure damages.] Griggs v. Allegheny County, 369 U.S. 84 (1962) reversing 402 Pa. 411 (1961) is the leading case in Pennsylvania. The United States Supreme Court held, in reversing the Pennsylvania Supreme Court, that low flying airplanes constituted a 'taking' for which viewers could award damages. 'A "taking" occurs when the entity clothed with the power of eminent domain substantially deprives an owner of the beneficial use and enjoyment of his property.' Griggs, supra, at page 414. Snitzer, Pennsylvania Eminent Do-

main, 6, §201 (1)-1 (b), 1965-1970 Supplement (1965)."

Like many definitions, this sounds very well but, upon analysis, is not particularly helpful in any given factual situation. Fortunately, there are certain leading decisions which have refined and expanded this rule so as to afford us sufficient guidelines to determine the instant case. It is also of some comfort to the opinion writer that both petitioners and the Authority rely upon these cases although they read and interpret them to somewhat different ends.

The first and, of course, particularly controlling, is Conroy-Prugh Glass Co. v. Commonwealth, 456 Pa. 384, 321 A.2d 598 (1974). There, petitioners owned industrial buildings near the northern end of a state bridge in Allegheny County. To connect with a proposed highway, the ramps had to pass through the appellants' property. The Commonwealth had submitted seven alternative plans for the extension, none of which had yet been formally approved but each of which involved a complete taking of the appellants' property. The proposals had been widely publicized in the papers as a result of which petitioners lost tenants at such a rate that income did not cover taxes and operating expenses and the property was listed for tax sale. The property owner filed for appointment of viewers alleging a de facto taking and the Commonwealth filed preliminary objections which were sustained by the Commonwealth Court on the reasoning that the facts did not "give rise to such 'exceptional' circumstances" as would constitute a de facto taking of appellants' property. In reversing, the Supreme Court stated that since the condemnation of the property was inevitable, appellant was not

simply a property owner whose property had declined in value due to the imminence of condemnation but was, in fact, under the evidence, one who could not use his property and stands to lose it. Throughout the decision, it is apparent that the court is strongly influenced by the "inevitability" of condemnation.

Perhaps the leading case is Petition of Cornell Industrial Electric Inc., 19 Pa. Commonwealth Ct. 599, 338 A.2d 752 (1975). In affirming the Court of Common Pleas of Allegheny County which had dismissed the preliminary objections of the Urban Redevelopment Authority of Pittsburgh, the court first noted that there was no question but that the appellees' property would ultimately be acquired by the Authority. Consistent with this expected acquisition, the Authority's representative had suggested to appellee that it should be prepared to relocate sometime before the acquisition. Relying on this, the appellee moved its business to a new location, incurring a substantial higher rental cost, the Authority selectively negotiated with owners of other properties within the area to be acquired, appraised the appellant's property, tried for and received funding and acquired and demolished other properties in the area. During this time the property owner made various attempts to rent the subject premises and finally received inquiry from a prospective tenant who desired to rent the property for a five year term. However, upon consulting with the Authority, the appellee was advised that the use of the property could not be guaranteed for that long a period and the property therefore remained vacant without generating any income. There was further evidence that because of the vacancy of the property and the general con-

dition of the neighborhood, extensive theft and vandalism had occurred, the owner was cited for violations of the City Building and Health Codes and was unable to maintain insurance coverage on the property. The court stated: "The imminence of acquisition, combined with the condition of the property itself and the area in general, effectively prevent appellee from leasing or selling its property. The Authority had made no offer to purchase the property, nor have they filed a declaration of taking, even though the plans still list the property as to be acquired.

"It is clear that there must be exceptional circumstances present in a case to constitute a de facto taking. See Crosstown Appeal, supra. We believe that the instant case exhibits such exceptional circumstance. The record clearly supports the decision below that appellee has been deprived of the use and enjoyment of his property and is entitled to just compensation. There is little doubt that appellee's present situation is a direct result of the Authority's actions. Appellee's relocation was based on the advice of Authority officials and the imminence of acquisition, not dissatisfaction with the location or facilities. This fact, combined with the general deterioration of the area resulting from the present stage of implementation of the Authority's redevelopment plan, have destroyed any potential rental or purchase market for the property. This property is essentially useless. Appellee is left with the cost of maintaining the property, yet with no ability to make use of it or have it generate any income. We believe such a situation falls within what the courts have sustained as a de facto taking. See Conroy-Prugh, supra."

In Reingold v. Urban Redev. Auth. of Pgh., 20

Pa. Commonwealth Ct. 266, 341 A.2d 915 (1975), a de facto taking was upheld when the evidence showed that the property owner was advised that the property was to be acquired, received an offer from the Authority, and was told that if she was dissatisfied with the offer she could proceed under the Eminent Comain Code for determination of just compensation. Thereafter, the offer was revoked and a new project plan was formulated, not including the appellee's property. Nevertheless, the property owner was advised not to enter into a long term lease because of the possibility of an acquisition under an alternative phase of the renewal plan. Adjacent properties continued to be acquired by the Authority within the area and as a result of these activities, all rental income from the property was lost and thw owner was threatened with the loss of the property itself by way of a tax sale. The property during its vacancy was vandalized, fire insurance was canceled, and the building ultimately condemned for violations of the Health and Safety Code. The court concluded "the property is, thus, virtually useless and unmarketable and cannot generate sufficient income to meet taxes as the result of U.R.A. precondemnation activities. Given this evidence, which the trier of fact accepted as credible, we can only conclude that Reingold has established the taking of her property which entitles her to just compensation." Page 269.

An excellent discussion as to necessary factors involved in establishing a de facto taking is to be found in Commonwealth's Crosstown Exp. Appeal, supra. The posture of the case was somewhat different for there the lower court had dismissed the preliminary objections without a hearing and thus

the court had to decide whether averments in the petition were legally sufficient to state a cause of action for compensable injury by reason of a de facto taking. The court noted, however, that a de facto taking did not occur when a property is included in a planning stage or program but that such factors must be considered when further actions in acquisition stage have occurred.

Snitzer, in his Pennsylvania Eminent Domain (1976 cumulative supplement, page 10), interprets the law as expounded in the above decisions as follows: "These cases teach that 'mere' publicity, regardless of its effects, be it withdrawal of tenants, inability to secure new tenants or similar consequences will not, even when coupled with negotiations with the affected property owner or others, constitute a 'de facto' taking, unless the condemnation is either inevitable and will result in the loss of title to the property prior to the formal condemnation because of condemnor's precondemnation activity and publicity, (Conroy-Prugh), or, when property had been rendered virtually valueless by specific acts of the condemnor in addition to general precondemnation activity and publicity."

In evaluating the facts in the instant case, it must first be noted that petitioners in the pleadings and in the several hearings failed to distinguish between actions on the part of the Commonwealth and actions on the part of the Redevelopment Authority. The essential steps taken, and there is no real issue of fact concerning them, are set forth at the beginning of the opinion and show, in essence, interest, planning, appraising and attending publicity but no funding, negotiating or acquisition. Hence, there was never an inevitabil-

ity or imminence of condemnation. On the contrary, there was an obvious abandonment of the whole project, apparently, although it is not clear, because of a change in the Commonwealth's plans. There was no evidence that petitioners were not free at any time to do what they wanted with their properties. The key factor in the decisions allowing de facto takings is direct, continuing activity against the properties involved in the area and such confronting action is lacking in the instant case.

There was considerable evidence of a general decline and deterioration in the area but this is not the determining factor under section 502(e) of the Eminent Domain Code. As the court noted in the Petition of Cornell Industrial Electric Inc., supra, "[t]he taking came about, not as a result of the condition of the area, whatever the cause of that condition, but because of the Authority's actions affecting this appellee's use of its property." Page 605.

In the Reingold case, supra, the Commonwealth Court stated in a footnote: "It is not disputed that the Manchester area was deteriorating and marked by population shifts before its designation as blighted in 1968. The issue here, however, is the cause of the impairment of the marketability of the Reingold property, and the record sufficiently establishes that this condition was caused by U.R.A. actions directed against this property rather than from the general communital deterioration."

In addition, the Authority presented evidence through a qualified expert appraiser who made a comparison with a controlled area that, in his opinion, the activities of the Authority were not responsible for any decline in value or impairment of

marketability in the Capitol Park Extension area but that the decline was attributed to factors that affect the City of Harrisburg as a whole. He stated in part (N.T., 2nd hearing, pages 60, 61): "All of the factors totaled together would indicate to me that there is really nothing unusual in the Capitol Park Extension area that is not found in the controlled area itself [Allison Hill] which are felt to be indicative of the city as a whole."

Accordingly, we enter the following

### ORDER

And now, August 15, 1977, the preliminary objections of the Redevelopment Authority of the City of Harrisburg are sustained and the petitions for appointment of viewers are dismissed.