## Conroy-Prugh Glass Co., Appellant, *v.* Commonwealth.

Argued September 26, 1973. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, NIX and MANDERINO, JJ.

*J. Craig Kuhn,* with him *Kuhn, Engle, Blair and Stein,* for appellant.

*Andrew L. Weil,* Special Assistant Attorney General, with him *Robert W. Cunliffe,* Deputy Attorney General, and *Israel Packel,* Attorney General, for Commonwealth, appellee.

Opinion by Mr. Justice O'Brien, July 1, 1974:

Appellant, Conroy-Prugh Glass Company (Conroy), is the owner of two four-story interconnected industrial buildings located at 1430 Western Avenue in the City of Pittsburgh, near the northern end of the West End Bridge on Pittsburgh's Northside. According to appellant,[1] beginning in 1959, the Commonwealth of Pennsylvania has promulgated, publicized, and partly carried into execution, plans for the extension of the Ohio River Boulevard on both sides of appellant's property, but the construction of the interchange between the West End Bridge and the Ohio River Boulevard has not yet been started. Since 1963, the Commonwealth has submitted seven alternative plans for the section of the extension of the proposed highway which includes the interchange, but none has yet been formally approved. Each of the seven alternative proposals involves a complete taking of appellant's property.

The proposed extension of the Ohio River Boulevard has been widely publicized in the Pittsburgh papers, because it seriously affects the economic future of Pittsburgh's Northside area. Prior to the beginning of the publicity about the highway program, appellant received rental income in excess of $30,000 in the years 1960, 1961 and 1962, when seventy percent of the useable floor space was occupied. By reason of the public announcements made by the Commonwealth throughout the 1960's, and particularly the publicizing of the preliminary design plans for the extension of the Ohio River Boulevard, appellant began to lose tenants at an

---

[1] The averments related herein were taken in part from appellant's petition, in part from those of appellant's request for admissions, to which the Commonwealth agreed (See Pa. R. C. P. 4014), and in part from an affidavit filed by appellant's president. All of these averments were properly considered by the Court of Common Pleas and by the Commonwealth Court, since they are all part of the record in this case.

accelerated rate so that, during the years 1966 and 1967, only fifty percent of the useable floor space was occupied and, in the years 1968, 1969 and 1970, occupancy was so diminished that rentals did not cover taxes and operating expense. In 1971, the property was listed for sale by the Treasurer's Office of the City of Pittsburgh. Finally, on March 7, 1971, appellant filed a petition for the appointment of viewers under §502(e) of the Eminent Domain Code of 1964, 26 P.S. §1-502(e), alleging that the Commonwealth had effected a taking of its property, but had not filed a declaration of taking. The Commonwealth filed preliminary objections to the petition for the appointment of viewers, alleging, *inter alia*, that appellant had failed to set forth a cause of action under the Eminent Domain Code, and failed to set forth the date of the alleged taking or in what manner the alleged taking occurred.

Appellant then filed a request for admissions consisting of nine requests concerning some of the above-related facts about the preliminary designs and the publicity concerning the proposed extension of the Ohio River Boulevard, to most of which the Commonwealth agreed. Appellant then filed a motion for summary judgment and an affidavit containing the above-related facts concerning the rental history of the property during the period immediately prior to and after the publicizing of the proposed highway extension and the fact that the loss of rents had led to the property's being listed for Treasurer's Sale. After argument, the Court of Common Pleas of Allegheny County sustained the Commonwealth's preliminary objections and denied appellant's motion for a summary judgment, reasoning that the facts presented by appellant did not "give rise to such 'exceptional circumstances' as would constitute a de-facto taking of appellant's property."

Appellant then appealed to the Commonwealth Court, which affirmed the decision of the Court of

Common Pleas of Allegheny County. *Conroy-Prugh Glass Co. v. Commonwealth*, 7 Pa. Commonwealth Ct. 66, 298 A.2d 672 (1972). We granted allocatur because of the importance of the issues involved.

The Pennsylvania Legislature recognized the concept of "de facto" taking when it enacted §502(e) of the Eminent Domain Code, providing: "If there has been a compensable injury suffered and no declaration of taking therefor has been filed, a condemnee may file a petition for the appointment of viewers. . . ."

We defined such a taking in the case of *Griggs v. Allegheny County*, 402 Pa. 411, 414, 168 A.2d 123, 124 (1961), reversed 369 U.S. 84 (1962), when we said: "A taking occurs when the entity clothed with the power of eminent domain substantially deprives an owner of the beneficial use and enjoyment of his property."

Since the *Griggs* case, the only appellate decision finding that a de facto taking might have occurred in a highway construction project was *Commonwealth's Crosstown Expressway Appeal*, 3 Pa. Commonwealth Ct. 1, 281 A.2d 909 (1971). In *Crosstown*, the court related the following: "The acts and activity of the Commonwealth beginning in September 1967 alleged to constitute compensable injury to his property, and thus a *de facto* condemnation, consist of public proclamations of the proposed route; public statements of the imminence of condemnation which would probably occur on or before December 1, 1968; negotiating for and amicably acquiring properties within the proposed route; notice to tenants and owners of properties of the imminence of condemnation including tenants and prospective tenants of the petitioner's premises; appraisal activity; public announcements that just compensation would be paid to the condemnees; and the urging of the City of Philadelphia to impede private development of properties within the proposed route and to approve the project. Also specifically averred

is the loss of tenants by the property owner and his inability to find new tenants by reason of these acts and activity of the Commonwealth." At page 3.

In its opinion in the instant case, the Commonwealth Court apparently seeks to distinguish its decision in *Crosstown, supra,* on the grounds that in *Crosstown,* unlike the instant case, although there had been no formal condemnation of the property involved, there had been amicable acquisition of nearby properties and notices to owners of property in the neighborhood and their tenants that condemnation was imminent. We do not find the distinctions to be significant. The amicable acquisition of other property in the neighborhood is important because it shows that the Commonwealth's plans for the proposed highway were fixed and the condemnation of the complaining owner's property was inevitable. However, in the instant case, according to Conroy's averments, the condemnation of its property is equally inevitable because of its location with regard to the West End Bridge. That bridge is already owned by the Commonwealth and its location fixes the location of connecting ramps between the bridge and the proposed highway. Consequently, no matter where the proposed highway is built, since it must be connected with the bridge and since Conroy's property is located at the end of the bridge, the eventual formal condemnation of appellant's property is inevitable as can be seen by the fact that all seven plans filed for the proposed project show a taking of appellant's property.

In our view, in addition to the fact that in both *Crosstown* and the instant case, the eventual condemnation of the property was inevitable, a significant fact about the properties is that in both cases the property owner alleges that the publicity about the inevitable condemnation caused a loss of tenants, making the property useless for its highest and best use—commercial property. It is the presence of this fact which

serves to distinguish *Crosstown* and the instant case from *Commonwealth Appeal,* 422 Pa. 72, 221 A.2d 289 (1966). In that case, we held that the recording of a plan designating the future location of a proposed highway which recording precluded a property owner from making any improvements within the designated route, did not constitute a "taking." After deciding that the Commonwealth's recording could not constitutionally deprive an owner of compensation for improvements made subsequent to the recording, we concluded that the Commonwealth's actions did not deprive the owners of the use of their property. In other words, *Commonwealth's Appeal, supra,* involved merely publicity about a proposed taking of vacant land. Nothing was present to hinder the continued use of the property.

A case more closely resembling the instant case is *Philadelphia Parkway,* 250 Pa. 257 (1915). In that case, the owner of property in the path of the proposed Philadelphia Parkway, which, like the Ohio River Boulevard Extension, was constructed in sections, sought reinstatement of his petition for viewers, despite the absence of a formal taking, on a showing that the eventual route was fixed because some neighboring properties had been taken by condemnation, some had been acquired, and some work had been done on other parts of the Parkway and a showing that his property had been adversely affected by a depreciation in rents. In ruling in favor of the property owner, we said: "Now a word as to the situation of abutting owners whose properties are affected by the proposed improvement. The municipal arm of the city has lain upon all properties within the lines of the parkway, with such restrictions and limitations as are implied thereby, for a period of about twelve years. New buildings cannot be erected, nor can valuable improvements be made without risk of loss. Rental values have been depreciated and general market values seriously affected. Certainly this

condition of affairs should not be permitted to continue indefinitely without redress to property owners who are injured thereby. More especially is this true when the Constitution guarantees to the private owner 'just compensation' for property so 'taken, injured or destroyed.' The facts show that appellant has suffered grievous injury and should be compensated. If so, why not now? The only answer is that the city has not formally ordered the opening, and therefore there has been no taking within the meaning of the law. Our reply has already been indicated. What the city has done is equivalent to notice that the parkway will be opened and completed and that the lands required for this purpose will be appropriated under the power of eminent domain unless otherwise acquired. Indeed as we view it the city has committed itself to the opening by a series of acts more expressive of its fixed purpose than could be indicated by a resolution to open without anything more. Our conclusion is that under the facts of this case the property of the appellant has been injured and what the city has done constitutes a taking in the constitutional sense."

The Commonwealth argues that to hold that a combination of the circumstances which occurred in this case constitutes a de facto taking would be to fly in the face of recent requirements that there be advance notice and hearings at which all possibly affected property owners will have an opportunity to be heard before a public improvement, such as a highway, is approved. See Public Law 85-767, August 27, 1958, 72 Stat. 902, as amended (23 U.S.C.A. 128); Act of May 29, 1945, P. L. 1108, §2, as amended (36 P.S. §2391.2); and Act of May 6, 1970, Act 120, P. L. 356, No. 275 (71 P.S. §512). The Commonwealth admits that all of the publicity that is now required can tend to depreciate property within the designated area, but, according to the Commonwealth, this problem has been

solved by the Legislature by its enactment of §604 of the Eminent Domain Code, which provides: "Any change in the fair market value prior to the date of condemnation which the condemnor or condemnee establishes was substantially due to the general knowledge of the imminence of condemnation, other than that due to physical deterioration of the property within the reasonable control of the condemnee, shall be disregarded in determining fair market value."

While in ordinary circumstances, the presence of §604, which did not exist at the time of the *Philadelphia Parkway* case, and the protections it affords a property owner whose property has declined in value because of the imminence of condemnation, might lead to a conclusion that a decline in value after the eventual location of a proposed condemnation has become fixed, without more, should not be enough to constitute a de facto taking, the instant case does not involve such ordinary circumstances. Appellant is not simply a property owner whose property has declined in value due to the imminence of condemnation. Appellant is, instead, one who cannot use his property and, in fact, stands to lose his property because of the imminence of condemnation! According to appellant's averments, the Commonwealth's publicity about the imminence of condemnation has caused appellant to lose tenants at such an accelerating rate that rental income from the property is no longer sufficient to cover the taxes on the property. Thus, appellant finds itself facing a Treasurer's sale. Should we hold that no "taking" has yet occurred until the formal condemnation, §604 of the Eminent Domain Code will be of no help to appellant because appellant will not be the owner of the property when the condemnation finally takes place. Recognizing, as we do, that the Commonwealth is required to publicize and hold hearings in advance of the initiation of formal condemnation proceedings, we believe that

when these hearings and this publicity cause the owner of a property to lose tenants to such an extent that the property no longer generates sufficient income to pay the taxes, which, in turn, leads to a threatened loss of the property, that property owner has a right to the appointment of viewers to award it compensation for its property. To hold that a property owner in such circumstances has no such remedy would be to deprive that property owner of his property without due process of law.

In our view, §502(e) of the Eminent Domain Code was intended to cover just such a condition as occurred here. By its terms, it provides a property owner with the substantive remedy of filing a petition for the appointment of viewers, thereby guaranteeing the constitutional right of just compensation for private property taken for public use.

The Commonwealth also argues that our decision will lead to a multiplicity of claims which could "render public improvements so costly as to defer any future planning and any publicity until such time as funds had been actually set aside for the project" which would seriously impede the planning necessary for such projects. We do not agree with this analysis. Our decision does not open the courts to the owners of all properties within an area designated for future condemnation. Rather, in order for a property owner to rely on this decision to support his petition for the appointment of viewers under §502(e) of the Eminent Domain Code, that owner must be able to allege significant facts to entitle him to relief.[2]

---

[2] Conroy has averred that: (1) the location of the proposed public improvement has become so fixed that condemnation of its property is inevitable; (2) publicity over an extended period about the imminence of that inevitable condemnation has caused the property owner to lose tenants so that the property no longer generates sufficient income to cover taxes and operating expenses; and (3) as a consequence, the property owner faces the loss of its property.

Since, if true, the averments in appellant's petition, together with the Commonwealth's admissions and the affidavit of appellant's president, are sufficient to entitle Conroy to the appointment of viewers, the Commonwealth's preliminary objections should not have been sustained and a hearing should be held on appellant's petition.

Orders of the Commonwealth Court and the Court of Common Pleas of Allegheny County are reversed and the case is remanded for further proceedings consistent herewith.

Mr. Chief Justice JONES and Mr. Justice EAGEN dissent.

Mr. Justice POMEROY took no part in the consideration or decision of this case.