Anna Reingold *v.* Urban Redevelopment Authority of Pittsburgh, Appellant.

Argued May 6, 1975, before President Judge BOW-MAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*Marion E. Popiel,* for appellant.

*William P. Bresnahan,* with him *O'Donnell, Bresnahan, Caputo & Capristo,* for appellee.

OPINION BY JUDGE CRUMLISH, JR., July 15, 1975:

This is an appeal by the Urban Redevelopment Authority of Pittsburgh (U.R.A.) from an order of the Court of Common Pleas of Allegheny County dismissing its preliminary objections to a petition for the appointment of viewers filed by Anna Reingold (Reingold) under section 502(e) of the Eminent Domain Code,[1] alleging a "de facto taking" of her property as the result of an urban renewal project undertaken by U.R.A. in the Manchester section of Pittsburgh. As we find the facts as well pleaded and proved at the hearing before the lower court on the preliminary objections to bring the case within the principles enunciated in *Conroy-Prugh Glass Co. v. Commonwealth,* 456 Pa. 384, 321 A. 2d 598 (1974), we affirm.

In *Conroy-Prugh, supra,* the Supreme Court held that where the precondemnation activities of a governmental entity clothed with the power of eminent domain "cause the owner of a property to lose tenants to such an extent that the property no longer generates sufficient income to pay the taxes, which, in turn, leads to a threatened loss of the property, that property owner has a right to the appointment of viewers to award it compensation for its property." 456 Pa. at 393, 321 A. 2d at 602. The instant case fits squarely within this scenario. In 1968, the Manchester area, including the Reingold property, was certified as blighted, and thereafter a redevelopment plan was submitted to the Pittsburgh City Council. After public notifications and hearings on the plan, City Council approved the plan in September of 1969, and U.R.A. thereafter entered into cooperative agreements with and made applications to local and federal agencies for funding of the project. Throughout this period, numerous public meetings were held by U.R.A. to explain to owners and tenants in the Manchester area the parameters and nature of the project including the relocation services

---

1. Act of June 22, 1964, Special Sess., P.L. 84, *as amended,* 26 P.S. §1-502(e) (Supp. 1974-1975).

which would become available. Title surveys were undertaken, and independent fee appraisers were retained to inspect and appraise the properties within the area—including the Reingold property—to be acquired.

In June of 1971, Reingold was advised that her property was to be acquired. She thereafter met with a staff negotiator of U.R.A. who made an offer of $21,000 for the property, and it was indicated at this time that if she was dissatisfied with the offer she could proceed under the Eminent Domain Code for a determination of just compensation. This offer was revoked in July of 1971, however, after it was learned that a new project plan had been completed by U.R.A. which did not include the Reingold property. Reingold was, nevertheless, advised by U.R.A. not to enter into a long-term lease with a prospective tenant because of the possibility of an acquisition under an alternative rehabilitation phase of the renewal plan. At the time of Reingold's petition for appointment of viewers, U.R.A.'s position was that the Reingold property was not to be acquired, although the adjacent property was acquired by U.R.A. and it continues a program of acquisitions and condemnations within the area.

The record before us establishes that, as a result of these activities, Reingold has lost *all* rental income from the property and is threatened with a loss of the property by way of a tax sale. The Reingold property had been rented for a number of years to a tenant who conducted a neighborhood tavern thereon with boarding rooms above, and for which Reingold has received steady rental payments. Beginning in 1968 with the crystalization of the Manchester project, however, this tenant experienced a marked loss in patronage as long-time residents of the area moved out or were displaced by U.R.A. The neighborhood gradually deteriorated as houses became vacant and transients occupied the abandoned dwellings.[2] This

2. It is not disputed that the Manchester area was deteriorating and marked by population shifts before its designation as

tenant was forced to vacate the premises in 1972 as his business income could no longer meet the rent. Although a replacement tenant was found, he only paid the rent for two months before he also vacated the premises. The property then stood vacant and was vandalized. As a result, Reingold's fire insurance was cancelled and the building was ultimately condemned by the City of Pittsburgh for health and safety code violations. The property is, thus, virtually useless and unmarketable and cannot generate sufficient income to meet taxes as the result of U.R.A. precondemnation activities. Given this evidence, which the trier of fact accepted as credible, we can only conclude that Reingold has established a taking of her property which entitles her to just compensation.

Order affirmed.

---

blighted in 1968. The issue here, however, is the cause of the impairment of the marketability of the Reingold property, and the record sufficiently establishes that this condition was caused by U.R.A. actions directed against this property rather than from the general communital deterioration. *See In Re: Petition of Cornell Industrial Electric, Inc. v. Urban Redevelopment Authority of Pittsburgh*, 19 Pa. Commonwealth Ct. 599, 338 A.2d 752 (1975).