436

515 A.2d 68

Commonwealth of Pennsylvania, Department of Transportation, Appellant *v.* Eric and Hazel M. Kemp, h/w, Appellees.

Commonwealth of Pennsylvania, Department of Transportation, Appellant *v.* Eric and Hazel Kemp, h/w, Appellees.

Argued April 7, 1986, before Judges ROGERS and DOYLE, and Senior Judge KALISH, sitting as a panel of three.

*J. Matthew Wolfe*, Assistant Counsel, with him, *Spencer A. Manthorpe*, Chief Counsel, and *Jay C. Waldman*, General Counsel, for appellant.

*George D. Harwood*, with him, *Murray S. Eckell*, *Eckell, Sparks, Levy, Auerbach & Monte*, for appellees.

OPINION BY JUDGE DOYLE, September 10, 1986:

This is a consolidated appeal by the Pennsylvania Department of Transportation (Department) from two orders of the Court of Common Pleas of Delaware County which disposed of Eric A. and Hazel Kemp's

(Kemp's) petition alleging a de facto taking under Section 502(e) of the Eminent Domain Code,[1] and the Department's subsequently-filed declaration of taking. The trial court's orders dismissed the Department's preliminary objections to Kemp's petition and struck the Department's declaration of taking, finding that the Department's pre-condemnation activities constituted a de facto taking of Kemp's property.

Hazel Kemp is the present owner of property located on the corner of Calcon Hook Road and Elmwood Avenue in Sharon Hill, Pennsylvania. Situated upon the property, facing Calcon Hill Road, is a single-family residential dwelling in which Mrs. Kemp has lived since 1960, when she and her now-deceased husband first purchased the property. Early in the 1970's the Kemps became aware that the Department was planning improvements to Calcon Hook Road which would involve reconstructing a bridge over the railroad and widening the road. Public hearings on this proposal were held in the Spring of 1971, but no further action was taken. In 1976, the Pennsylvania Public Utility Commission ordered the Department to reconstruct the railroad bridge on Calcon Hook Road. Public hearings on this project were held in 1981, and again in 1982. At that time the Department informed residents that Calcon Hook Road would be widened to twenty-seven feet, the grade of the road altered significantly, and a retaining wall erected. Accordingly, the Department's project required the condemnation of a section of Kemp's frontage on Calcon Hook Road, ranging in depth from eighteen feet to six and one-half feet. Upon the completion of the project, the front door of Kemp's house would be located six feet from the road right-of-way, where a retaining

---

[1] Act of June 22, 1964, Special Sess., P.L. 84, *as amended,* 26 P.S. §1-502(e).

wall two feet in height would be built. The road and the sidewalk would be elevated on the other side of the retaining wall, with no access provided to Kemp's property. Soon after the public hearings were held the Department entered Kemp's property in order to survey the land and take soil samples in preparation of the project. In 1983, the Department informed Kemp of its intent to take the property frontage, and made an offer of $10,400 as just compensation.

On April 11, 1984, Mrs. Kemp filed a petition for appointment of viewers, alleging that the Department's activities had resulted in a de facto taking of her entire property. On June 19, 1984, the Department filed a declaration of taking for the Kemp property frontage.[2] Each party filed preliminary objections to the other's petition, and both matters were heard together by the court of common pleas. After the hearing, the court

---

[2] We note that the present case does not involve a fact situation where the Pennsylvania Public Utility Commission itself appropriates property under Section 2702(b) of the Public Utility Code, 66 Pa. C. S. §2702(b), and thus has initial jurisdiction to determine damages. *See Huss v. Department of Transportation,* 99 Pa. Commonwealth Ct. 386, 512 A.2d 1356 (1986).

The Department's condemnation proceedings in connection with this bridge reconstruction project on Calcon Hook Road have been the subject of other litigation in the Delaware County Court of Common Pleas and this Court. *See Department of Transportation v. Southeast Delco School District,* 97 Pa. Commonwealth Ct. 485, 509 A.2d 981 (1986).

In *Southeast Delco,* argued the same day as the present case, we also reversed the trial court's finding of a de facto taking under similar facts where, despite the imminence of condemnation of a portion of a school's property, the school was not threatened with actual loss of the property and continued to use its remaining property for its intended use, constructing a new school upon it. *Id.* at 488, 509 A.2d at 983. We believe the result reached here is consistent with the result reached in that opinion.

found that the Department's pre-condemnation plans and activity had put properties abutting Calcon Hook Road in "imminence of condemnation" since at least 1981. The court found that, as a result, Kemp had suffered and would continue to suffer great financial loss, that she would be unable to sell her property at any price, and that therefore the entire value of her property had been totally destroyed. The court thus concluded that there had been a de facto taking, and found the date of the take to be April 28, 1981.[3]

On appeal the Department argues that the trial court erred in finding that there was a de facto taking, contending that the Department's activity did not substantially deprive Kemp of the use and enjoyment of her property.

In order for a condemnee to prove that a de facto taking has occurred, he must show exceptional circumstances which have substantially deprived him of the use and enjoyment of his property. *Department of Transportation v. Lawton*, 50 Pa. Commonwealth Ct. 144, 412 A.2d 214 (1980). A condemnee must show that an entity, clothed with the power of eminent domain, exercised that power and that the damages sustained by the condemnee were the immediate, necessary and unavoidable consequence of that exercise. *Lawton*. In the present case the Department concedes that there has been an actual taking of the *frontage* of Kemp's property resulting in a loss in value to the remaining property, but argues that there has been no de facto taking of

---

[3] The Court's opinion, dated December 6, 1984, states that date of taking as April 28, 1981, in both its finding of facts and conclusions of law. The Court's order, however, dated August 30, 1984, states the date of taking as April 28, 1971. The 1971 date is consistent with the Court's comments which appear in the transcript of the hearing. Because of our resolution of this case, we need not resolve this apparent inconsistency. *See infra* note 7.

Kemp's *entire* property because Kemp has not been deprived of her residential use of the property.[4]

The trial court found that Kemp was deprived of the use of her property because 1) the construction of the road itself would place the house only six feet from the road and would deny access from the house to the road, and 2) the imminence of the construction project resulted in the complete loss of value of the property and the inability to sell the property at any price. Despite these findings it is apparently an uncontroverted fact that Kemp continues to live in the house on the property, as she has for the past twenty-five years. Kemp's own testimony elicited that although the house no longer has access to Calcon Hook Road, there continues to be access to Elmwood Avenue through a driveway which has not been affected by the construction. There was no evidence presented that the house itself was unusable due to structural damage or a disruption in essential services.

Thus, we are faced with the novel question of whether a residential property owner who continues to reside in and make use of her residential property, despite adverse pre-condemnation activity, can be said to be "substantially deprived of the beneficial use and enjoyment of her property." Under the facts of this case, we conclude that she cannot.

An examination of the caselaw in this area reveals that the issue of whether an owner has been substantially deprived of the beneficial use of his property has been considered primarily in the context of an income-producing commercial property. In *Conroy-Prugh Glass Co. v. Commonwealth,* 456 Pa. 384, 321 A.2d 598

---

[4] It is important to emphasize that Kemp's de facto condemnation claim alleges a taking of Kemp's *entire* property, and not simply of the frontage within the highway's proposed right of way.

(1974), the Pennsylvania Supreme Court held that a de facto taking had been shown where (1) the location of the proposed public improvement had become so fixed that condemnation of the owner's property was inevitable, (2) publicity over an extended period about the imminence of that inevitable condemnation had caused the property owner to lose tenants so that the property no longer generated sufficient income to cover taxes and operating expenses, and (3) as a consequence, the property owner faced the loss of his property. Thus, in *Conroy-Prugh* and the cases which have followed it, the courts' inquiry is whether the property owner has demonstrated by substantial evidence that a formal condemnation of his land was inevitable, and that the loss of rental income and the unmarketability of the property was the proximate result of the Department's activity. *Lawton; Department of Transportation v. Pastuszek*, 55 Pa. Commonwealth Ct. 138, 422 A.2d 1223 (1980); *Reingold v. Urban Redevelopment Authority of Pittsburgh*, 20 Pa. Commonwealth Ct. 266, 341 A.2d 915 (1975); *Petition of Cornell Industrial Electric, Inc.*, 19 Pa. Commonwealth Ct. 599, 338 A.2d 752 (1975).

In such cases, once it has been shown that the eventual taking of the property through condemnation is inevitable, evidence of unsuccessful attempts to sell the property are not necessary to show a de facto taking. *Standard Investments Corp. v. Commonwealth*, 28 D. & C. 3d 294 (1983), *affirmed on the opinion of the trial court, sub. nom. DOT v. Standard Investments Corp.*, 80 Pa. Commonwealth Ct. 649, 472 A.2d 282 (1984), *affirmed per curiam*, 506 Pa. 337, 485 A.2d 392 (1984). Neither is it necessary that the property be subject to a tax or sheriff sale if it can be shown that the property itself does not generate income sufficient to cover taxes or existing mortgages. *Id.* at 308.

Moreover, although the imminence of condemnation is typically a key factor, this Court has held that even in

the absence of the imminence of a condemnation a de facto taking was shown where exceptional circumstances substantially deprived an owner of beneficial use and enjoyment of his property. *McCracken v. City of Philadelphia*, 69 Pa. Commonwealth Ct. 492, 431 A.2d 1183 (1982). Thus, in *McCracken*, a three-year construction project which closed the street on which the owner's property was located, resulting in loss of business and consequential inability to meet the cost of maintenance of the property, constituted a de facto taking.[5]

While these cases tend to place emphasis on the financial viability of the property in reaching their decisions, it is not clear that such an approach would be appropriate in the present case involving residential property. Whether a particular activity deprives a property owner of the beneficial use and enjoyment of a property is, of course, dependent upon the type of use the owner has given to the property.[6] In the cases cited above, all of which involve property held for commercial purposes, the loss in value and the inability to rent or sell the property are obviously relevant to whether the property is no longer income-producing and thus

---

[5] In contrast, however, mere uncertainty concerning future condemnation plans without resulting loss of tenants or loss of income to support the property was held insufficient to constitute a de facto taking in *Miller Appeal*, 55 Pa. Commonwealth Ct. 612, 423 A.2d 1354 (1980).

[6] The beneficial use of a property includes not only its present use, but also all potential uses, including its highest and best use. *Visco v. Department of Transportation*, 92 Pa. Commonwealth Ct. 102, 498 A.2d 984 (1985). In the absence of evidence to the contrary, however, the presumption is that the property's present use is the highest and best use, and the burden is on the property owner to show that the property is adaptable for another use and that there is a need for another use. *Id.; Shillito v. Metropolitan Edison Co.*, 434 Pa. 172, 252 A.2d 650 (1969).

whether it has lost its commercial use. *See, e.g., Conroy-Prugh, McCracken, Standard Investments.* In the case of a *residential* property, on the other hand, the loss in value and the inability to sell such a property are not themselves evidence that an owner has lost the use of his property *as a residence.* A property may continue to be used as a residential home whether or not it is marketable as such. In such cases unmarketability becomes relevant only to the extent that it reflects the imminent loss of the residence itself due to an inevitable condemnation. We conclude, therefore, that mere unmarketability of a residential property does not substantially deprive the owner of his residential use unless the unmarketability is a result of the property's inevitable condemnation such that a cloud has been placed on the property's title rendering it completely valueless. *See Pastuszek; Standard Investments.*

In the present case, the real estate expert testified that the property had some value, but that the house was unmarketable because of its proximity to the road. Nonetheless, the expert admitted that Kemp could still live in the house. Indeed, as stated earlier, all the evidence indicates that Kemp has continued to live in the house and that her use of her house has not changed significantly as a result of the Department's construction activity. In addition, while condemnation of the *frontage* of Kemp's property was inevitable, and was, in fact, accomplished by the later filing of the Department's declaration of taking, the Department's plans never contemplated a *total* taking of Kemp's property and house located on it. Thus, there was no evidence that the house and remaining property were in the path of future highway development and were to face eventual condemnation. We must therefore conclude that the trial court's findings that Kemp's entire property was in imminence of condemnation, that it was totally without value, and

that Kemp was deprived of the use of her property, were not supported by the evidence.

Kemp acknowledges that she continues to have physical possession of the house, but contends that she does not have beneficial use because of the taking of the frontage and the elimination of access to Calcon Hook Road. While such changes have no doubt made the house less desirable to live in, they have not prevented Kemp from using the house as a residence and thus have not substantially deprived her of that use. Kemp also argues that she has been deprived of the "financial viability" of the property because it has become unmarketable. Once again, while this indeed may be the case, Kemp did not own the property as a commercial venture in which continued financial viability and marketability were necessary for the beneficial use of the property. Moreover, Kemp's property continues to retain some value and can be used as a residence without fear of eventual condemnation. Thus, under these facts, the lack of marketability did not deprive Kemp of her residential use of the property.

In conclusion, it should be remembered that the property owner's burden of proof in a de facto condemnation case is a heavy one. *Holmes Protection of Pittsburgh, Inc. v. Port Authority of Allegheny County,* 90 Pa. Commonwealth Ct. 342, 495 A.2d 630 (1985). Without question, the depreciation and the lack of marketability are compensable injuries to the property which may be recovered as damages resulting from the Department's taking of the property's frontage. But they do not themselves substantially deprive the property owner of the use of her property, and thus cannot support a finding of a de facto taking.

Accordingly, we reverse the order of the trial court in No. 84-4190 and sustain the preliminary objections to Kemp's petition for appointment of viewers. In addition,

we reverse the order of the trial court in No. 84-7275, and remand for further proceedings on the Department's declaration of taking as may be necessary.[7]

### ORDER

NOW, September 10, 1986, the order of the Court of Common Pleas of Delaware County, No. 84-4190, dated August 30, 1984, is hereby reversed and Kemp's petition for appointment of viewers is dismissed.

The order of the above court, No. 84-7275, dated August 29, 1984, is hereby reversed and the matter remanded for further proceedings as may be needed.

Jurisdiction relinquished.

---

[7] Because we conclude that there was no de facto taking, we need not address the Department's argument that the trial court erred in finding the date of the de facto taking to be April 28, 1971.

---

DISSENTING OPINION BY SENIOR JUDGE KALISH:

I respectfully dissent.

In de facto takings, the term property used in the concept of "substantial interference with the beneficial use of property," is viewed not as a physical object, but rather as a "bundle of rights" or legal interests pertaining to the ownership of the physical object, which rights are constitutionally protected. Ownership is the aggregate of these rights, and the value of this ownership is reflected in the degree of dominion over one's own property.

In commercial property one of the rights in the bundle is of an economic nature, namely, that investment backed expectations should not be substantially impaired. That appears to be the reasoning behind the standard used in recent de facto takings of commercial properties. While such pre-condemnation activities as recording of plans, agency announcements, negotiations

with owners, and real estate appraisal activities are insufficient to constitute a taking, when governmental conduct and its external effects become so onerous and harmful as to interfere with the fundamental right of ownership, a de facto taking occurs. *Conroy-Prugh Glass Co. v. Commonwealth,* 456 Pa. 384, 321 A.2d 598 (1974); department of Transportation v. Standard Investments Corp., 80 Pa. Commonwealth Ct. 649, 472 A.2d 282 (1984), *aff'd* 506 Pa. 337, 485 A.2d 392 (1984); *Peter Roberts Enterprises, Inc. v. Department of Transportation,* 31 Pa. Commonwealth Ct. 479, 376 A.2d 1028 (1977).

I agree that this standard is difficult to apply to residential property. While "use" is an important and fundamental right of ownership or legal interest contained within the bundle of rights, so is the right to sell or market one's property. Here too, where the government's conduct and the external factors caused by it, become so onerous and so harmful as to interfere with this fundamental right, there is a de facto taking. That is particularly so where, as here, it is accompanied by a substantial interference with the beneficial use and enjoyment of one's property. Together, there is sufficient impairment with the right of dominion over one's property to constitute a de facto taking. "Use" encompasses beneficial use and enjoyment of one's property. Otherwise, use has no real or substantial meaning. A deprivation of this right should not be made to depend on whether the owner remains in the home.

In addition to the usual pre-condemnation activities, the trial court considered such external factors as proximity to the highway, access interference, the need for a retaining wall, elevation of the sidewalk, and marketability.

I do not believe that the Department's subsequent *de jure* condemnation of a portion of the property ought

to affect the original de facto taking. It is the original departmental conduct and the external factors caused by it, that substantially interfered with the fundamental right of ownership.

I believe the record substantially supports the findings of fact and conclusion that a de facto taking occurred, made by the trial judge. He should be affirmed.