In re CONDEMNATION BY the COMMONWEALTH of Pennsylvania, DEPARTMENT OF TRANSPORTATION, OF the RIGHT–OF–WAY FOR STATE ROUTE 0079, SECTION 290, A LIMITED ACCESS HIGHWAY IN the TOWNSHIP OF CRANBERRY.

Norberry One Condominium Association, et. al.,

v.

Commonwealth of Pennsylvania, Department of Transportation.

Appeal of Norberry One Condominium: Association; Martin V. Dorsch; Vincent Cannella, III and Sharon M. Cannella; Joseph S. Scafoglio and Nancy Scafoglio; Linda A. Hogan; Donna Wylie; Guy R. Palermo, II, Pamela

Breier, Carl J. Palermo and Alan M. Palermo; Paul A. Eastland; Lee A. Ivory and Suzann Seanof Ivory; Susan L. Slezycki and Edward Slezycki; Olga P. Simmons; Cheryl A. Stanley; Dennis A. Bischoff; Marlene Nooning and John Ungham.

Commonwealth Court of Pennsylvania.

Argued May 7, 2002.

Decided Aug. 14, 2002.

William P. Bresnahan, Pittsburgh, for appellants.

Jeffrey L. Giltenboth, Pittsburgh, for appellee.

Before: LEADBETTER, Judge, LEAVITT, Judge, and McCLOSKEY, Senior Judge.

OPINION BY Judge LEAVITT.

This is an appeal of the order of the Court of Common Pleas of Butler County (trial court) sustaining the preliminary objections of the Department of Transportation (DOT) to a Petition for Appointment of Viewers [1] filed by the Norberry One Condominium Association (Association), a non-profit corporation, and twelve individual condominium owners (collectively Norberry). Norberry asserts that construction of a highway entrance ramp 60 feet from the Norberry One Condominium Building (Norberry One) effects a *de facto* condemnation and, therefore, the trial court erred in sustaining DOT's preliminary objections. For the reasons set forth below, we affirm the trial court.

This matter arises out of a Connector Project (Connector Project) undertaken by DOT and by the Pennsylvania Turnpike Commission (Turnpike) to connect the Pennsylvania Turnpike and Interstate Route 79 (I–79) at the Cranberry Interchange of the Pennsylvania Turnpike in Cranberry Township, Butler County. The Turnpike and DOT divided responsibilities for the joint project; DOT agreed to be responsible for the acquisition of property needed to complete the Connector Project. Planning for the Connector Project began in 1989. By 1995, DOT published a report that selected a plan entitled "Alternative 3A Modified" from the number of alternate plans considered for the Connector Project. The 3A Modified Plan called for the total taking of Norberry One.

In January of 1996 the Connector Project was put on hold due to funding problems. In October of 1997, DOT considered the Connector Project ready to proceed, but it was delayed again due to a decision of the Turnpike to alter its toll collection system, necessitating a design change.

In 1998, a consultant retained by DOT for relocating persons displaced by the Connector Project, made initial contact with Cheryl Stanley, a resident and unit owner in Norberry One and the secretary of the Association. At this meeting Ms. Stanley directed the DOT consultant to talk with her and no one else; he provided Ms. Stanley with a number of brochures

---

1. The trial court also sustained DOT's preliminary objections to Norberry's preliminary objections to DOT's Declaration of Taking, thereby dismissing Norberry's preliminary objections. While procedurally complex, the legal issue in all filings was the same: whether DOT's pre-condemnation activities effected a *de facto* condemnation of Norberry One.

for the residents of Norberry One and, consistent with her directions, did not contact any other tenants or unit owners.

In 1999, as a result of the design change, the Turnpike adopted an alternative implementation plan known as "Alternate K." The Connector Project was reconfigured so that only a portion of the Norberry One parking lot would be taken, as opposed to the entire property. "Alternate K" required the construction of an access ramp to the connector highway to be built within sixty feet of a corner of the Norberry One building. The sloping ramp was to be elevated by a concrete wall twelve to fourteen feet in height above ground level with a fifty-two inch high "jersey barrier" on top.

On May 3, 2000, DOT filed a Declaration of Taking and served a Notice of Filing of Declaration of Taking upon the Association president, who was also the property manager, but not upon any individual unit owner. The Declaration of Taking identified a part of the Norberry One parking lot and a construction easement as the "taking."

On June 1, 2000, Norberry filed preliminary objections to the Declaration of Taking, requesting the trial court to declare the Declaration of Taking void and of no effect or to declare the taking to be a *de facto* condemnation of the entire building. Norberry's preliminary objections identified procedural deficiencies in the Declaration of Taking, and it alleged that the project would so deplete the parking lot as to make the units uninhabitable as would the noise, fumes, debris and other effects of the construction. On June 15, 2000,

DOT filed preliminary objections to Norberry's preliminary objections to DOT's Declaration of Taking.[2]

On June 19, 2001, Norberry filed a Petition for the Appointment of Viewers asserting a *de facto* taking arising from DOT's pre-condemnation activities. On June 29, 2001, DOT filed preliminary objections to Norberry's Petition for Appointment of Viewers.

Upon agreement of the parties and approval of the trial court, the record was developed by depositions and other discovery. After the issues were briefed, the trial court issued its ruling sustaining DOT's preliminary objections to Norberry's preliminary objections to DOT's Declaration of Taking. It also sustained DOT's preliminary objections to Norberry's Petition for Appointment of Viewers. The trial court vacated its prior order appointing a Board of View and dismissed Norberry's Petition for Appointment of Viewers. Norberry appeals the trial court's order to this court.[3]

On appeal, Norberry raises both procedural and substantive issues, as it did below. It contends that DOT's Declaration of Taking was procedurally deficient because of improper service and failure to include certain information required by statute. Substantively, it contends that the pre-condemnation activities of DOT effected a *de facto* taking of Norberry One thereby entitling it to just compensation.

## I.

Norberry initially challenges the trial court's decision because it did not rule

---

2. In the meantime, on November 24, 2000, Norberry granted DOT right of way to allow construction to begin.

3. Our scope of review of a trial court's dismissal of preliminary objections to a petition for appointment of a board of viewers is limited to determining whether the trial court's

findings are supported by competent evidence in the record, whether the trial court abused its discretion or whether it committed an error of law. *Elser v. Department of Transportation*, 651 A.2d 567 (Pa.Cmwlth.1994), *appeal denied*, 540 Pa. 650, 659 A.2d 988 (1995).

on procedural deficiencies Norberry raised in its preliminary objections. This challenge is compromised by Norberry's failure to place into the record the specific documents needed to prove the alleged deficiencies. An appellate court may only consider evidence developed below that is duly certified in the record. For purposes of appellate review, what is not of record does not exist. Pa. R.A.P. 302(a); *City of Pittsburgh Commission on Human Relations v. DeFelice*, 782 A.2d 586 (Pa. Cmwlth.2001). However, to the extent the procedural claims of Norberry are pure questions of law, we may resolve them. *Otte v. Covington Township Road Supervisors*, 539 Pa. 44, 650 A.2d 412 (1994). With these principles in mind, we address Norberry's claim of procedural deficiencies.

■ First, Norberry argues that the description provided in the Declaration of Taking is inadequate to meet the requirements of Section 402(b) of the Eminent Domain Code (Code), 26 P.S. § 1–402(b).[4] The caption itself states that the taking is "for a right-of-way for State Route 0079m, Section 290, a limited access highway in the township of Cranberry." However, Norberry claims the description "in fee simple and a temporary construction easement" does not adequately describe the title, and it further decries DOT's failure to attach a plan of its Declaration of Taking.

Section 402 of the Code does not require a plan to be attached to the filing of a Declaration of Taking. It requires "[a] description of the property condemned *sufficient for the identification thereof* ...." 26 P.S. § 1–402(b)(5). The schedule of property attached to the declaration identifies the deed book, by volume and page number, where the condemned property is located as well as the pages where a plot plan are recorded in the Recorder's Office. We cannot agree that this does not describe the property to be condemned. Further, "fee/simple" and "easement" are terms sufficient to identify the nature of the title acquired.

4. Section 402(b) of the Code provides;

(b) The declaration of taking shall be in writing and executed by the condemnor, shall be captioned as a proceeding in rem, and shall contain the following:

(1) The name and address of the condemnor.

(2) A specific reference to the statute, article and section thereof, under which the condemnation is authorized.

(3) A specific reference to the action, whether by ordinance, resolution or otherwise, by which the declaration of taking was authorized, including the date when such action was taken, and the place where the record thereof may be examined.

(4) A brief description of the purpose of the condemnation.

(5) A description of the property condemned sufficient for the identification thereof, specifying the city, borough, township or town and the county or counties wherein the property taken is located, a reference to the place of recording in the office of the recorder of deeds of plans showing the property condemned or a statement that plans showing the property condemned are on the same day being lodged for record or filed in the office of the recorder of deeds in such county in accordance with section 404 of this act.

(6) A statement of the nature of the title acquired, if any.

(7) A statement specifying where a plan showing the condemned property may be inspected in the county in which the property taken is located.

(8) A statement of how just compensation has been made or secured.

Section 402(b) of the Act of June 22, 1964, Sp.Sess. P.L. 84, *as amended*, 26 P.S. § 1–402(b). Norberry also contends a violation of Section 402(b) because DOT did not name or serve the twelve unit holders; however, as can be seen from the text of Section 402(b), it does not address service.

■ Next, Norberry argues that DOT violated Section 404 of the Code,[5] 26 P.S. § 1–404. Section 404 provides that "[t]he condemnor, upon filing its declaration of taking, shall on the same day lodge for record a notice thereof in the office of the *recorder of deeds ...*" and specifies the content of this notice. 26 P.S. § 1–404. The certified record references the filing of something in the Butler County Recorder of Deeds Office on May 3, 2000 at 9:29 a.m. Because the document has not been made part of the record, we are unable to address Norberry's claims that the content of this notice is deficient. *DeFelice*, 782

A.2d at 593. In any case, if Norberry's argument is that DOT had to include Section 404 information in its Declaration of Taking, it lacks merit. The pleading requirements for a declaration of taking are governed by Section 402 of the Code; the Section 404 requirements for a notice of the taking to be filed with the recorder of deeds do not apply to the declaration of taking itself.

■ Last, Norberry contends that DOT violated Section 405 of the Code, 26 P.S. § 1–405, because it did not provide notice to the twelve unit owners of the condominium.[6] It also raises other techni-

**5.** Section 404 of the Code provides,

The condemnor, upon filing its declaration of taking, shall on the same day lodge *for record a notice thereof in the office of the recorder of deeds of the county in which the property is located.* If the property is located in two or more counties, the notice shall be recorded in all such counties. *The notice shall specify the court term and number of the declaration of taking and the date it was filed,* and shall contain a description or plan of the property condemned sufficient for the identification thereof and *the names of the owners of the property interests condemned, as reasonably known to the condemnor,* and shall be indexed in the deed indices showing the condemnee set forth in the notice as grantor and the condemnor as grantee. If plans are to be recorded as part of the notice they shall be submitted on standard legal size paper. If plans are to be filed as part of the notice they shall be in legible scale and filed in a condemnation book or file or microfilmed, with a notation as to the condemnation book and page number, file number or microfilm number to be made by the recorder on the margin of the notice. The recorder shall receive as a fee for recording each notice the sum of five dollars ($5) plus one dollar ($1) for each page recorded after the first, and for filing plans two dollars and fifty cents ($2.50) for each page or sheet of plan filed and twenty-five cents (25¢) for each name indexed. Upon the notice being assigned a book and page number by the recorder of deeds the condemnor shall file with the prothonotary under the caption of the dec-

laration of taking a memorandum of the book and page number in which the notice is recorded.

Section 404 of the Act of June 22, 1964, Sp.Sess. P.L. 84, *as amended,* 26 P.S. § 1–404 (emphasis added).

**6.** Section 405 of the Code provides,

(b) The notice shall be served within or without the Commonwealth, by any competent adult, in the same manner as a complaint or writ of summons in assumpsit, or by certified or registered mail, to the last known address of the condemnee. If service cannot be made in the manner as provided, then service shall be made by posting a copy of the notice upon the most public part of the property and by publication of a copy of the notice omitting the plot plan required by subsection (c)(8), one time each in one newspaper of general circulation and the legal journal, if any, published in the county.

(c) The notice to be given the condemnee shall state:

(1) The caption of the case.

(2) The date of filing of the declaration of taking and the court term and number thereof.

(3) The name of the condemnee or condemnees to whom it is directed.

(4) The name and address of the condemnor.

(5) A specific reference to the statute, article and section thereof, under which the condemnation action is authorized.

(6) A specific reference to the action, whether by ordinance, resolution or

cal deficiencies arising from Section 405, but, again, we are unable to address them [7] because the notice is not part of the certified record. *DeFelice*, 782 A.2d at 593. We are however, able to address whether service was appropriate; this is a pure question of law. *Otte*, 539 Pa. at 49, 650 A.2d at 414.

The Code is the complete compendium of the procedural and substantive law [8] for all condemnations of property. Section

405(b) provides that the "[t]he notice shall be served within or without the Commonwealth, by any competent adult, in the same manner as a complaint or writ of summons in assumpsit, or by certified or registered mail, to the last known address *of the condemnee.*" 26 P.S. § 1–405(b). DOT argues that because only a common area, part of the parking lot, was to be taken and the resulting award is to be paid to the Association,[9] service on the Associa-

otherwise, by which the declaration of taking was authorized, including the date when such action was taken, and the place where the record thereof may be examined.

(7) A brief description of the purpose of the condemnation.

(8) A statement that the condemnee's property has been condemned and a reasonable identification thereof in the case of a total taking and, in the case of a partial taking, a plot plan showing the condemnee's entire property and the area taken.

(9) A statement of the nature of the title acquired.

(10) A statement specifying where a plan showing the condemned property may be inspected in the county in which the property taken is located.

(11) A statement of how just compensation has been made or secured.

(12) A statement that if the condemnee wishes to challenge the power or the right of the condemnor to appropriate the condemned property, the sufficiency of the security, the procedure followed by the condemnor or the declaration of taking, he shall file preliminary objections within thirty days after being served with notice of condemnation.

(d) Service of a copy of the declaration of taking, together with the information and notice required by subsections (c)(2), (c)(8) and (c)(12) hereof, shall constitute compliance with the notice requirements of this section.

(e) The condemnor shall file proof of service of said notice.

Section 405 of the Act of June 22, 1964, Sp.Sess. P.L. 84, *as amended,* 26 P.S. § 1–405.

7. They include: the notice does not contain the names of the plaintiff-condemnors as required by Section 405(c)(3); the notice does not contain an adequate description as required by section 405(c)(7); the notice does not contain a plot plan as required by Section 405(c)(8); the notice does not contain an adequate statement of the nature of the title condemned as required by Section 405(c)(12); the notice does not contain a statement on the right to challenge the Declaration as required by section 405(c)(12).

8. Section 303 of the Act of June 22, 1964, Sp.Sess., P.L. 84, *as amended,* 26 P.S. § 1–303, states:

It is intended by this act to provide a complete and exclusive procedure and law to govern all condemnations of property for public purposes and the assessment of damages therefore, except as provided in section 901: Provided, however, That nothing in this act shall be deemed to affect, vary, alter or modify the jurisdiction or power of the Public Utility Commission of the Commonwealth of Pennsylvania, the State Mining Commission created under the act of June 1, 1933 (P.L. 1409), as reenacted and amended, or any act providing for the assessment of benefits for public improvements on the properties benefited. This act is not intended to enlarge or diminish the power of condemnation given by law to any condemnor.

9. 68 Pa.C.S. § 3107(c) relating to eminent domain actions involving condominiums provides:

Acquisition of part of common elements.— If part of the common elements is acquired by eminent domain, the award must be paid to the association. The association shall

tion's president was sufficient. Under the Code, however, service is to be made on the *condemnee,* not on the party that will receive the payment.

The Code defines a condemnee as "the owner of a property interest taken, injured or destroyed, but does not include a mortgagee, judgment creditor or other lienholder." Section 201 of the Code, 26 P.S. § 1–201. Here, the deed of each owner of a Norberry One unit describes the property to include both a specific and an undivided interest in the common elements appurtenant thereto.[10] DOT's Declaration of Taking identified a "common element appurtenant" to a Norberry One unit as the subject of the taking, which, by deed, is owned by each unit owner. Accordingly, the twelve unit holders were entitled to notice of the Declaration of Taking.

■ Procedural irregularities, however, will not set aside a condemnation decision where the condemnee has not been prejudiced. *Avery v. Commonwealth,* 2 Pa. Cmwlth. 105, 276 A.2d 843, 844 (1971). In *Avery,* the appellants challenged a condemnation because the notice from the Department of Forests and Waters failed to state that some of the land to be condemned was located in townships other than the township identified in the notice, and an oral, as opposed to written, approval to the project was given by the Secretary of Forest and Waters. This Court held that the Department had substantially complied with the notice and authorization procedures, and thus, the doctrine of strict construction of the Code should not

apply. In *Avery,* Appellants attended the hearings, were fully aware of the Department's intentions with respect to their property, and were not misled in any material way.

This reasoning was also followed in *In re Lands of Patterson,* 722 A.2d 1176 (Pa. Cmwlth.1999), where the condemnor used the language of Pa. R.C.P. 1018.1 (notice to defend) rather than that language required by Section 405(c)(12) of the Code in its declaration of taking. This Court held that although the notice did not inform the condemnee that she had to file preliminary objections, she was not prejudiced because she had, in fact, filed preliminary objections and participated in the proceeding. Thus, these pleadings did not provide a basis to set aside a condemnation.

Here, although the Declaration of Taking was not served on the unit owners, they were not prejudiced. Each unit owner filed preliminary objections to the Declaration of Taking and petitioned the trial court to appoint a Board of Viewers. Furthermore, each unit owner had an opportunity to participate fully in the condemnation process.

Norberry has failed to show any error by the trial court by failing to sustain its preliminary objections to DOT's Declaration of Taking on grounds of procedural irregularities. Irregularities which were limited to the service did not prejudice Norberry in pursuing its claim of a *de facto* condemnation. Thus, Norberry's preliminary objections on the basis of pro-

---

divide any portion of the award not used for any restoration or repair of the remaining common elements among the unit owners in proportion to their respective common element interests before the taking, but the portion of the award attributable to the acquisition of a limited common element must be equally divided among the owners

of the units to which that limited common element was allocated at the time of acquisition, or in any manner the declaration provides.

10. The deeds to each unit were appended as exhibits to each unit owners deposition testimony contained in the certified record.

cedural irregularities were properly overruled.

## II.

Norberry's appeal is focused upon a substantive law challenge to the trial court's decision. It asserts that the trial court erred in not finding a *de facto* taking of Norberry One. Norberry advances two theories in support of *de facto* taking: first, the pre-condemnation relocation activities of DOT effected a total taking by destroying commercial use of the property, as opposed to the partial *de jure* taking asserted in the Declaration of Taking, and, second, the noise and proximity of the access ramp will make Norberry One uninhabitable as a residence.[11]

A *de facto* condemnation occurs when the entity clothed with the power of eminent domain substantially deprives an owner of the beneficial use and enjoyment of his property. *Griggs v. Allegheny County*, 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962). There are three elements that a property owner must show in order to establish a *de facto* taking. First, the condemnor must have the power to condemn the property. *Jacobs Appeal*, 55 Pa.Cmwlth. 142, 423 A.2d 442 (1980). Second, the property owner must establish that there are *exceptional circumstances* that substantially deprive the property owner of the beneficial use and enjoyment of the property. *Conroy–Prugh Glass Company v. Department of Transportation*, 456 Pa. 384, 321 A.2d 598 (1974). Third, the property owner must demonstrate that the deprivation is the immediate, necessary and unavoidable consequence of the exercise of the power to condemn. *In re: 1301 Filbert Limited Partnership*, 64 Pa.Cmwlth. 605, 441 A.2d 1345 (1982).

These elements of a *de facto* taking are simple to articulate but difficult to apply. Pennsylvania courts seek to balance the public need for roads and highways, which are constructed at great cost to the taxpayer, against the rights of the individual property owner. Accordingly, the case law on *de facto* takings is very fact sensitive. *Visco v. Department of Transportation*, 92 Pa.Cmwlth. 102, 498 A.2d 984 (1985); *Waldron Street Book Company v. City of Pittsburgh*, 771 A.2d 111 (Pa. Cmwlth.2001). Here, the central issue [12] is whether exceptional circumstances *exist* that have effectively deprived the property owner of the beneficial use of his property. The property, Norberry One, has both commercial and residential uses.

In *Conroy–Prugh*, our Supreme Court considered a commercial enterprise that was losing tenants at an accelerated rate because of the anticipated condemnation. By the time a claim was filed, occupancy had diminished to the point that rentals did not cover taxes or operational expenses. The circumstances were so dire that the property was listed for treasurer's sale. The Court found these circumstances exceptional and, thus, a *de facto* taking. The property owner was not facing a mere decline in value due to the imminence of the condemnation, but in fact, a total loss. *Conroy–Prugh*, 456 Pa. at 392, 321 A.2d at 602.

---

**11.** Norberry also challenges a finding of the trial court that Norberry failed to establish that the Secretary of Transportation acted in a capricious or fraudulent matter. While we understand the context of the trial court's conclusion, Norberry's response is misdirected. We find no evidence that the trial court imposed a "fraud" standard in concluding there was not a *de facto* taking.

**12.** There really is no question about the other two factors. DOT has the power to condemn, and the deprivation, if it exists, is an unavoidable consequence of the Connector Project.

Loss of income and inability to rent or sell the property are relevant considerations where the property, as in *Conroy–Prugh,* is commercial. The inability to sell the residential property, however, does not mean that the owner has lost use of the property so long as he can reside there. *Department of Transportation v. Kemp,* 100 Pa.Cmwlth. 436, 515 A.2d 68 (1986), *aff'd per curiam,* 517 Pa. 309, 535 A.2d 1051 (1988), *Department of Transportation v. Smoluk,* 100 Pa.Cmwlth. 422, 514 A.2d 1000 (1986), *aff'd per curiam,* 517 Pa. 309, 535 A.2d 1051 (1988). What is essential in a residential *de facto* taking is whether the property can continue to be used as a residence. *Department of Transportation v. Steppler,* 114 Pa. Cmwlth. 300, 542 A.2d 175 (1988).[13]

Norberry One is both a commercial and residential property; some of the unit owners reside in their units while others lease to tenants. Norberry claims that DOT's pre-condemnation activities destroyed the commercial value of those units held for lease and that the visual and sound impact of the Connector Project has made Norberry One an unfit place to reside. They cannot support these claims with evidence.

Norberry's evidence related to factors identified in *Conroy–Prugh* that have the potential to show the exceptional circumstance of a *de facto* taking of a commercial property. The factors are:

  a. A potential loss of property and mortgage foreclosures; or

  b. The loss of rental income; or

  c. The loss of tenants so that the property was made useless for its highest and best use; or

  d. The property could not generate income sufficient to cover taxes or the existing mortgage; or

  e. The inability of the property to generate income through an ordinary sale such as a result of the condemnors' activities.

*Conroy–Prugh,* 456 Pa. at 392, 321 A.2d at 602. These were the factors considered by the trial court.[14] Thus, Norberry attempted to show rental revenue was down, sales were sluggish and financing for sales, should they even occur, would be difficult to obtain. The trial court found, however, that Norberry's case did not withstand close scrutiny.

Norberry's expert report on sales was rejected because the expert restricted the data to the time period during which the Connector Project was being planned. By contrast, DOT's expert looked at the history of all the units in the Norberry complex, six buildings, not just Norberry One, from inception. All the buildings sit fifty

---

**13.** DOT asserts that it has not been able to find a single case where our courts actually found a *de facto* taking of a residence. Our holdings above support the notion that it is a theoretical possibility, but the facts needed to support such a conclusion have not presented themselves, at least in recent years. The seminal U.S. Supreme Court case, *Griggs,* involved a Pennsylvania residence. Because of overhead flights, thirty feet above the roof, every few minutes, the residents could not talk in person or on the phone; they could not sleep, even with sleeping pills; the noise from the planes caused the windows to rattle and plaster to fall. In addition, the family lived in an extreme fear after they were informed by a representative of the Airlines Pilots Association that an engine failure would leave the pilot "no course but to plow into your house." *Griggs,* 369 U.S. at 87, 82 S.Ct. 531. Because the house was rendered uninhabitable, the U.S. Supreme Court found a *de facto* taking.

**14.** Norberry asserts that the trial court required Norberry to prove elements of all five impacts noted. We find no support for this argument in either the decision of the trial court, or in the record.

feet from Interstate 79, were built at the same time and are in the same market position. Few units in any of the buildings have sold above the initial price, indicating that the first owners overpaid. Foreclosures have occurred in Norberry One and in the other buildings, but they occurred before there was any activity on the Connector Project. Reproduced Record 542a—543a (R.R. ——). One sale of a unit in Norberry One occurred even after the announcement of Alternative 3A, the total taking. R.R. 659a. One attempt to sell a unit in Norberry One was made after the announcement of a partial taking, but it was withdrawn from the market after six months. R.R. 645a.

▮ The record shows that monthly rents at Norberry One ranged from $500 to $700. This suggests that owners could have raised rents to $700, and one owner did raise the rent from $500 to $525. R.R. 608a. Most of the testimony was to the effect that unit owners were afraid to raise rent.[15] This is not sufficient to show a de facto taking; the law of eminent domain does not compensate for speculative damage. *In re: 1301 Filbert Limited Partnership*, 441 A.2d at 1360.

Absent from Norberry's case is evidence of actual, imminent loss by the unit owners. There was no present threat of foreclosure for any unit or proof of actual rental income loss. There was no proof that a bank had turned down a financing loan (although widely rumored to be the case). R.R. 628a. There was no loss of tenants, as in *Conroy–Prugh*, such that the

property was made useless for its highest and best use as a condominium. There was no evidence that the owners could not generate income sufficient to cover taxes, expenses or any existing mortgage. In fact, taxes were being paid, as were the bills for Norberry One's electricity, water, snow removal and grass cutting. R.R. 616a, 648a, 714a, 778a.

▮ Norberry also tried to establish that the noise levels of the Connector Project have deprived the owners of the use and enjoyment of their property to the point of a *de facto* taking. Generally, an increase in noise does not establish a *de facto* taking. *Berk v. Department of Transportation*, 168 Pa.Cmwlth. 560, 651 A.2d 195 (1994) (wherein we held that increased noise and dust did not establish a *de facto* taking). Here, Norberry One sits fifty feet from Interstate 79; highway noise is a fact of residing in one of its units.

▮ The trial court rejected Norberry's noise claim. In making this finding, it relied on DOT's expert on noise, found to be more credible than Norberry's expert. DOT's expert testified to a preconstruction decibel rating of sixty-eight, but opined that when the project was complete, it would be reduced to sixty-seven. R.R. 178a, 179a. Norberry's expert had far less experience than DOT's expert; indeed, this was his first study of highway noise. R.R. 461a. He relied principally on data generated by DOT's expert to produce a five-page report.[16] The trial court decision to find DOT's noise expert "more credible"

---

15. Inaction by an owner is not adequate to meet the evidentiary burden needed in a *de facto* taking. *See Appeal of Miller*, 55 Pa. Cmwlth. 612, 423 A.2d 1354, 1357 (1980).

16. DOT's report did not have numbered pages, but it measured seven-eighths of an inch thick. Norberry challenges DOT's expert because he holds an associate's degree from Harrisburg Area Community College, while Norberry's expert holds several advanced degrees, including a Ph.D., from Purdue University and the University of Pittsburgh. DOT's expert, however, had extensive experience. A credibility determination cannot be overturned on the basis of a *curriculum vitae*.

appears well founded. We cannot make new and different credibility determinations on appeal. *Pennsylvania Game Commission v. Benek*, 32 Pa.Cmwlth. 133, 378 A.2d 497 (1977).

 Whether a property owner has been deprived of the beneficial use and enjoyment of his property is dependent upon the type of use the owner has given to the property. *Kemp*, 515 A.2d at 72. The presumption is that the property's present use is the highest and best use. *Visco*, 498 A.2d at 986. Before us is the record of both commercial and residential use, property with eleven out of the twelve units occupied as of the time of the depositions and the remaining unit in the process of being leased. The highest and best use of the property in this case is as a residence or as a rental property, and there is no evidence that the owners have lost their use of the property as a residence or as a rental property. Where there is no substantial deprivation of a property's highest and best use, there can be no *de facto* taking. *Department of Transportation v. Steppler*, 114 Pa.Cmwlth. 300, 542 A.2d 175 (1988).

## CONCLUSION

Norberry did not make the exceptional case required in order for it to meet its burden of showing a *de facto* taking. There is no basis to require DOT to acquire property that it does not need or desire in order to complete the Connector Project. The proceeding on the Declaration of Taking will allow Norberry to be compensated for the depreciation in property values that may be caused by the project. *Kemp*, 515 at 73.

For the forgoing reasons, we affirm the decision of the trial court.

## ORDER

AND NOW, this 14th day of August, 2002, the order of the Court of Common Pleas of Butler County of October 24, 2001, in the above-captioned matter is hereby affirmed.