555 A.2d 1379

Commonwealth of Pennsylvania, Department of Transportation, Appellant *v.* Michael C. DiFurio, Appellee.

Michael C. DiFurio and Exxon Company, U.S.A. *v.* Commonwealth of Pennsylvania, Department of Transportation. Exxon Company, U.S.A., Appellant.

Argued December 16, 1988, before Judges DOYLE and COLINS, and Senior Judge BARBIERI, sitting as a panel of three.

*William J. Cressler,* Assistant Counsel, with him, *Spencer A. Manthorpe,* Assistant Chief Counsel, and *John L. Heaton,* Chief Counsel, for appellant, Department of Transportation.

*Richard C. Biedrzycki,* Of Counsel: *Phillips and Phelan,* for appellant, Exxon Company, U.S.A.

*George D. Harwood,* with him, *Murray S. Eckell,* Of Counsel: *Eckell, Sparks, Levy, Auerbach, Monte & Moses,* for appellee, Michael C. DiFurio.

OPINION BY SENIOR JUDGE BARBIERI, March 17, 1989:

The Department of Transportation (DOT) and Exxon Company, U.S.A. (Exxon) appeal the order of the Court of Common Pleas of Delaware County dismissing their preliminary objections to a petition for the appointment of a board of viewers filed by Michael DiFurio (Appellee) alleging a *de facto* taking of his leasehold interest pursuant to Section 502(e) of the Eminent Domain Code

(Code), Act of June 22, 1964, P.L. 84, *as amended*, 26 P.S. §1-502(e). We affirm.

Appellee operated the Rolling Green Exxon Service Station under a lease from Exxon located at the corner of Springfield and Sproul Roads in Broomall, Pennsylvania. Appellee's leasehold interest was situated in the path of Legislative Route 1010, popularly known as the Blue Route, pursuant to a plan of development first recorded in 1969. In March of 1985, Appellee was notified that the frequently delayed construction of the Blue Route was set to resume. A plan authorizing the condemnation of Appellee's property for a section of the Blue Route was filed on August 9, 1985. Appraisal activity for the section of the highway in question began during June of 1986.

On August 1, 1986, Exxon and DOT notified Appellee that "the Blue Route was coming through" and that his leasehold would be terminated in the near future. A DOT relocation advisor was appointed on this date and a DOT right of way agent visited Appellee's service station on August 14, 1986. DOT sent Appellee a ninety day letter asserting that the right of way would be cleared by December of 1986. DOT did not formally condemn the property in December of 1986, but instead sent Appellee another ninety day letter, followed by a thirty day letter. Appellee continued to operate his service station until DOT filed a formal declaration of taking condemning the entire property on April 14, 1987.

On August 28, 1986, Appellee filed this instant petition for an appointment of a board of viewers asserting that DOT's pre-condemnation proceedings coupled with twenty-five years of publicity concerning the path of the Blue Route had deprived Appellee of the use and enjoyment of his tenancy and substantially undermined and interfered with his business. Appellee's petition was amended on November 14, 1986, and Exxon was added as an unwilling petitioner.

Both DOT and Exxon filed preliminary objections to Appellee's petition. DOT asserted that since Appellee remained in possession and continued to operate his service station right up until the date of the formal taking on April 14, 1987, no *de facto* taking occurred. Exxon joined in DOT's argument and also contended that Appellee had no compensable right to damages because paragraph thirteen of Appellee's lease with Exxon contained a termination on condemnation clause that assigned all Appellee's rights on condemnation to Exxon. The trial court concluded that a *de facto* taking had occurred and that the terms of the lease did not bar Appellee from recovering damages to his leasehold interest. We will consider these issues *seriatim*.

## I. DE FACTO TAKING

Under review is the period of time from August 1, 1986 until April 14, 1987, when Appellee's service station designated for formal condemnation, and indeed formally condemned on the latter date, experienced a decline in business allegedly due to pre-condemnation activity and publicity. Generally, the adverse interim consequences caused to a property by the prospect of condemnation will not constitute a *de facto* taking unless the owner can show "exceptional circumstances" which substantially deprive him of the use and enjoyment of the property and such deprivation is the immediate consequence of the condemnor's power. *Conroy-Prugh Glass Co. v. Commonwealth*, 456 Pa. 384, 321 A.2d 598 (1974); *In Re: Filbert Limited Partnership Appeal*, 64 Pa. Commonwealth Ct. 605, 441 A.2d 1345 (1982).

Appellee's evidence in support of his petition was exhaustively summarized by the trial court. The onward march of the Blue Route after twenty-five years of infighting had been extensively publicized by the press. On

March 4, 1987, an article appeared in the local newspaper which publicized the impending "demolition" of Appellee's service station. Neighbors and loyal customers could see with their own eyes the trail of condemnations leading up to Appellee's station and a number of them declined to have Appellee fix their cars because they did not know how long Appellee would be in business.

It is to be noted that DOT did not help the situation by repeatedly issuing Appellee notices of imminent condemnation and then postponing the date of formal taking. This left Appellee in limbo as to exactly when the condemnation ax would fall. On September 4, 1986, DOT's relocation advisor visited Appellee's premises and began speaking to Appellee's employees without his knowledge regarding the imminence of condemnation. Afterwards, six out of twelve of Appellee's full time employees quit, including Appellee's station manager. Appellee had difficulty hiring new employees with the prospect of condemnation hanging over his head at some unspecified date. Appellee suffered from not being able to order gasoline or service products on a long term bulk quantity basis because he could not verify how long his service station would be in existence.

Appellee lost two of his five commercial accounts and his gasoline sales and repair business significantly declined after August of 1986. The trial court's decision not to permit DOT to introduce evidence of a decline in gasoline sales of other service stations in the area is within its discretion. Appellee was able to specifically tie the decline in his business to the prospect of imminent condemnation.

DOT did not formally condemn Appellee's property until nine months and three successive postponements after DOT's first ninety day notice of condemnation letter dated August 1, 1986 was sent. The trial court analogized

Appellee's plight to a property owner "just waiting for the wrecking ball of societal improvement, at the hands of the Commonwealth, while the recipient of the blow trying to operate a sinking business despite having no idea of the time the wrecking ball will strike." *DiFurio v. Department of Transportation* (No. 86-11560, filed December 24, 1987), slip. op. at 14.

The trial court's conclusion that the combination of factors in this case constitutes "exceptional circumstances" is supported by substantial evidence. *See Department of Transportation v. Lawton*, 50 Pa. Commonwealth Ct. 144, 412 A.2d 214 (1980): DOT's argument based on *Department of Transportation v. Steppler*, 114 Pa. Commonwealth Ct. 300, 542 A.2d 175 (1988) and *Gamma Swim Club, Inc. v. Department of Transportation*, 95 Pa. Commonwealth Ct. 167, 505 A.2d 342 (1986) that as a matter of law a decline in business revenues is insufficient to constitute a *de facto* taking as long as the business can cover its expenses is misplaced.

In both *Steppler* and *Gamma Swim Club* the petitioners owned the property in question. It is true that a decline in the value of real estate or rental income to the owner of real estate does not by itself constitute a *de facto* taking as long as the remaining real estate remains usable and has value. Appellee owns no real estate. Appellee is being compensated solely for the taking of a leasehold interest whose only value is the business income it produces. Loss of business income destroys the value of Appellee's leasehold. A substantial loss deprives Appellee of the use and enjoyment of the leasehold. *Conroy-Prugh*. If DOT's actions "take" a substantial portion of the income, it takes a portion of the leasehold interest. DOT's argument goes to the issue of damages, not to whether a taking has occurred.

## II. Termination on Condemnation Clause

Since we affirm the trial court in determining that a *de facto* taking occurred, we now inquire into whether or not Appellee has waived his right to compensation by the terms of paragraph thirteen of his lease with Exxon which provides as follows:

13. CONDEMNATION. If the entire premises shall be taken by condemnation or sold to the condemning authority under threat thereof, this lease shall terminate on the date of such taking or sale. If a part only of the premises shall so be taken or sold, and the balance of the premises is not suitable for the operation of a retail drive-in automobile service station, either party may terminate this lease at any time within forty-five (45) days following such taking or sale without liability to the other party therefor. Any and all payments made for or arising from any such taking or for damages to the *premises* resulting therefrom shall belong and be payable solely to Exxon, *except as otherwise provided by law.* (Emphasis added.)

The trial court held that clauses causing termination of the lessee's interest on condemnation are to be construed strictly against the lessor, *Hawk Sales Co., Inc. v. Department of Transportation*, 38 Pa. Commonwealth Ct. 535, 394 A.2d 657 (1978), and that the language of the lease assigning payments for a taking of the *premises*, related only to the actual physical property in question and not to Appellee's intangible leasehold interest.

However, in *Scholl's Appeal*, 292 Pa. 262, 141 A. 44 (1928), the Supreme Court held a similar termination on condemnation clause stating that the lease shall terminate as of the date title vested in condemnor barred a subtenant for recovering for the loss of his leasehold

interest. Exxon contends this holding has been followed in other jurisdictions and cites *Jersey City Redevelopment Agency v. Exxon Corp.*, 208 N.J. Superior Ct. 53, 504 A.2d 1207 (1986) and *Henson v. Department of Transportation*, 160 Ga. App. 521, 287 S.E.2d 299 (1982) as persuasive authority. We believe that the key to this case lies in the actions of the parties after the *de facto* taking occurred.

In *Scholl's Appeal*, both parties agreed that the lease in question expired on the date of condemnation. *Scholl's Appeal*, 292 Pa. at 266, 141 A. at 45. This did not happen in the present case. The *de facto* taking occurred in August of 1986. After this date Exxon made no attempt to terminate the lease or evict Appellee from its property. Appellee continued to pay rent to Exxon and operate its business right up to the date of the *de jure* taking on April 14, 1987. In fact, the rental amount was increased in September of 1986 from $1,350.00 per month to $1,890-.00 per month. Exxon continued accepting this rent until it finally terminated Appellee's lease on May 27, 1987, one month after the *de jure* taking. Exxon thus makes the unique argument that it is entitled to collect both lessee's rent and lessee's damages for taking of its leasehold interest during the period lessee was paying rent.

Whether Exxon can collect such a double recovery depends on the status of Appellee during the period between the *de facto* taking and the *de jure* taking. A lease is in the nature of a contract and is controlled by principles of contract law. *Pugh v. Holmes*, 486 Pa. 272, 405 A.2d 897 (1979). Paragraph thirteen of Appellee's lease provides that the lease terminates on condemnation and we hold that condemnation occurred in August of 1986. Therefore, Appellee's written lease terminated under its own terms in August of 1986. *See Vincent v. Redevelopment Authority of Washington County*, 87 Pa.

Commonwealth Ct. 470, 487 A.2d 1024 (1985). If Appellee remained on the property after this date and continued paying rent to lessor which was accepted, it can only have been as a tenant at will.

A tenancy at will is a leasehold interest which may be created by a tenant remaining on the property after his lease terminates with the consent of his landlord for an uncertain term which may be terminated by either party. *In Re Wilson's Estate*, 349 Pa. 646, 37 A.2d 709 (1944); *Lasher v. Redevelopment Authority of Allegheny County*, 211 Pa. Superior Ct. 408, 236 A.2d 831 (1967). This is precisely the situation Appellee was in after his written lease terminated by operation of law. Appellee remained on the property paying rent to Exxon on a month by month basis while waiting for the condemnation ax to fall at some uncertain future date.

In *Hawk Sales Co., Inc. v. Department of Transportation* at 38 Pa. Commonwealth Ct. 535, 544, 394 A.2d 657, 662 (1978), we held that as long as the leasehold continued to exist after the condemnation date, lessee is entitled to an apportionment of damages. In the present case, Exxon argues that Appellee's written lease terminated upon *de facto* condemnation while continuing to accept rent for eight months thereafter. The rent Exxon accepted after termination of the written lease proves Appellee's leasehold continued to exist as a tenancy at will and entitles Appellee to recovery. The order of the trial court is affirmed.

## ORDER

NOW, March 17, 1989, the orders of the Court of Common Pleas of Delaware County at No. 86-11560, dated September 29, 1987 and December 18, 1987, are hereby affirmed.

DISSENTING OPINION BY JUDGE DOYLE:

I must respectfully dissent to the majority opinion for several reasons, but principally on the grounds that the result reached is contrary to the basic principle that in order to have a *de facto* taking there must be exceptional circumstances which substantially deprive the condemnee of the use and enjoyment of his *property*, *Department of Transportation v. Lawton*, 50 Pa. Commonwealth Ct. 144, 412 A.2d 214 (1980), and, that the result creates dissimilar standards for the condemnation of the underlying fee and the condemnation of a leasehold interest. The resulting disparate standards are contrary to the provisions of the Eminent Domain Code,[1] (Code) and the present status of the law in Pennsylvania.

## I. DE FACTO TAKING

In the instant case, the condemnee, DiFurio, alleged that a *de facto* taking of his Exxon service station business by the Department of Transportation (Department) occurred on July 27, 1986. The Department filed its formal Declaration of Taking on April 14, 1987, nine months later, not an unreasonably long period of time under the circumstances.

When considering whether there has been a *de facto* taking of an income-producing commercial property, our prior cases have instructed that the owner must demonstrate by substantial evidence, (a) that a formal condemnation of his land was inevitable, (b) that the loss of rental income and the unmarketability of the property were the proximate results of the Department's activity, and, (c), the most critical element in this case, that the inevitable condemnation caused by the condemnor has made the property "useless for its highest and best use" and has

---

[1] Act of June 22, 1964, Special Sess., P.L. 84, *as amended*, 26 P.S. §§1-101—1-903.

rendered the condemnee "one who cannot use his property and, in fact, stands to lose his property because of the imminence of condemnation!" *Conroy-Prugh Glass Co. v. Department of Transportation*, 456 Pa. 384, 389, 392, 321 A.2d 598, 600, 602 (1974). *See also Department of Transportation v. Kemp*, 100 Pa. Commonwealth Ct. 436, 515 A.2d 68 (1986); *aff'd per curiam*, 517 Pa. 309, 535 A.2d 1051 (1988)); *Gamma Swim Club v. Department of Transportation*, 95 Pa. Commonwealth Ct. 167, 505 A.2d 342 (1986), *Lawton*. It is apparent that these cases place emphasis on the financial viability of the property being used as an ongoing business and the destruction of that business as the highest and best use of the *property* itself.

As approved by this Court, one of the key factors in assessing financial viability is whether the property generates "income sufficient to cover taxes and existing mortgages." *Standard Investments Corp. v. Commonwealth*, 28 D. & C. 3d 294, 308 (1982), *aff'd on the opinion of the trial court, sub nom. Department of Transportation v. Standard Investments Corp.*, 80 Pa. Commonwealth Ct. 649, 472 A.2d 282 (1984), *aff'd per curiam*, 506 Pa. 337, 485 A.2d 392 (1984). The instant case, of course, concerns a leasehold rather than fee ownership. As such, because a tenant is not as likely as an owner to pay taxes or a mortgage, a more appropriate standard would be whether the proximate result of the Department's activity prevents the tenant from generating income sufficient to cover overhead and operating expenses. *Cf. Conroy-Prugh*, 456 Pa. at 393 n.2, 321 A.2d at 602 n.2. Further, it should be remembered that a condemnee's burden of proof in a *de facto* condemnation case is a heavy one. *Holmes Protection of Pittsburgh, Inc. v. Port Authority of Allegheny County*, 90 Pa. Commonwealth Ct. 342, 495 A.2d 630 (1985), *petition for allowance of appeal denied,*

519 Pa. 656, 546 A.2d 60 (1988). Succinctly stated, I believe the standard for a *de facto* condemnation of less than a fee simple interest such as a leasehold and its attendant burden, should be no less than for the condemnation of the entire fee.

In the condemnee's effort here to meet his burden of showing exceptional circumstances, he introduced evidence that his gasoline sales declined after August 1986.[2] He also testified that subsequent to that date six of his twelve employees resigned and he lost two of his five commercial accounts. The majority concludes that this combination of factors amounts to substantial evidence of the exceptional circumstances required by *Lawton*.

I disagree and would find that, at most, DiFurio has shown a decline in business revenues and nothing more.[3] In *Gamma Swim Club*, this Court cited *Conroy-Prugh* for the proposition that a decline in value because of the imminence of condemnation, without more, is not enough to constitute a *de facto* taking. Therefore, in the case *sub judice*, the condemnee's showing of a decline in

---

[2] I have also concluded that the trial court erred by not permitting the Department to introduce evidence that gasoline sales declined generally in the immediate vicinity of Appellee's service station. Because Appellee's evidence of a decline in his gasoline sales was relevant to show business decline due to the anticipation of imminent condemnation, the Department's evidence of a similar decline at nearby stations because of other reasons should have been likewise relevant to show that Appellee's decrease in sales was not related to the condemnation.

[3] Appellee failed to prove that the income generated by his service station was insufficient to cover his operating expenses. As compelling evidence to the contrary, Appellee not only continued to pay rent to Exxon, but continued to make payments after his rent was *increased* in September 1986 (after the alleged *de facto* taking) from $1,350.00 monthly to $1,890.00 monthly. There is no indication in the record as to whether Exxon increased Appellee's rent or whether Appellee "volunteered" to pay the increased rental, as claimed by the Department, or whether rent was based on a percentage of sales.

service station revenues does not, by itself, constitute a *de facto* taking of his property interest without substantial evidence that his business no longer generated sufficient income to cover operating expenses. *Cf., Department of Transportation v. Steppler*, 114 Pa. Commonwealth Ct. 300, 542 A.2d 175 (1988); *Kemp; Department of Transportation v. Smoluk*, 100 Pa. Commonwealth Ct. 422, 514 A.2d 1000 (1986), *aff'd per curiam*, 517 Pa. 309, 535 A.2d 1051 (1988) (holding that a mere diminution of value of residential property is insufficient to establish a *de facto* taking of the entire property).

The majority distinguishes *Gamma Swim Club* and *Steppler* on the basis that in both, the petitioners *owned* the subject property, while here, Appellee was merely a tenant. In *Gamma Swim Club* and *Steppler*, however, this Court held that there was no *de facto* taking because the real estate remained usable and had value. Here, the majority concludes that the mere loss of business income destroyed the tenant's property interest. In other words, it means that if the Department's actions take a substantial portion of business income, it takes a portion of the leasehold interest as well. This distinction creates a different standard for tenants as distinguished from the owners of the property, and could engender a result where there might be a *de facto* taking of the leasehold, while at the same time no *de facto* taking of the underlying fee. The majority opinion expresses this concept as follows:

> Loss of business income destroys the value of the Appellee's leasehold. A substantial loss deprives Appellee of the use and enjoyment of the leasehold. Conroy-Prugh. If DOT's actions 'take' a substantial portion of the income, it takes a portion of the leasehold interest. DOT's argument

goes to the issue of damages, not to whether a taking has occurred. (Slip op. at 5.)

I respectfully disagree with the majority's statement because the interest which is taken is not a *partial* taking, but such a substantial portion of the property interest that the *total* property value itself is destroyed.

Equally foreign is the majority's concept of damages. Generally, of course, the exercise of the power of eminent domain is considered to be an *in rem* proceeding and damages are assessed or awarded as "just compensation" under Article 1, Section 10 of the Pennsylvania Constitution and Section 601 of the Code, 26 P.S. §1-601. Just compensation is defined by Section 602 (a) of the Code, 26 P.S. §1-602, as follows:

> Just compensation shall consist of the difference between the fair market value of the condemnee's entire property interest immediately before the condemnation and as unaffected thereby and the fair market value of his property interest remaining immediately after such condemnation and as affected thereby, and such other damages as are provided in this code.

This definition encompasses damages for *both* the underlying fee interest and the leasehold interest, and those joint claims must be resolved in one proceeding and be satisfied from the same fund or, more specifically, the same total award. Section 507(a) of the Code, 26 P.S. §1-507(a), requires that:

> The claims of all the owners of the condemned property, including joint tenants, tenants in common, life tenants, remaindermen, owners of easements, or ground rents, and all others having an interest in the property, and the claims of all tenants, if any, of the property, shall be heard or tried together and the award of the viewers or the

verdict on appeal from the viewers shall first fix the total amount of damages for the property, and second, apportion the total amount of damages between or among the several claimants entitled thereto.

It is still fundamental law in Pennsylvania that where there is a *total* taking of the property, as here, the interests of the owner and the interest of the lessee are in conflict because, as there can be only one damage award for the condemnation, whatever award is made to the tenant will diminish the award made to the owner. Moreover, we have held that the filing of a formal Declaration of Taking precludes a tenant from subsequently filing a petition for the appointment of viewers alleging a *de facto* taking under Section 502(e) of the Code, 26 P.S. §1-502(e). *Vercheak v. Redevelopment Authority of the County of Washington*, 44 Pa. Commonwealth Ct. 481, 405 A.2d 559 (1979). This property loss to the tenant, therefore, has come to be expressed as the difference between the rental value of the leased premises, and the rent actually reserved in the lease, *Getz v. Philadelphia and Reading Railroad Co.*, 105 Pa. 547 (1884), or put another way:

the difference between the rent the tenant *is* paying, as compared to the rent he should be paying on the free market. For example, a lease with ten months remaining provides for a monthly rental of $100.00 at the time of a total taking. If it is determined that the fair monthly rental value is $150.00, the value of the leasehold interest is 10 x $50.00, or $500.00 reduced to present value. Conversely, if it can be shown that the fair rental value is not worth more on the market than the contracted rent, the tenant has suffered no damages for the loss of his leasehold. (Under the

common law a total taking ceases the obligation of the [lessee] to continue paying rent. Dyer v. Wightman, 66 Pa. 425 (1870); Nichols on Eminent Domain, Matthew Bender & Company, 3rd Edition, 1951, Vol. 4, §12.42(3), p. 177; Under a partial taking, the tenant's obligation to pay rent continued, and the rent did not abate proportionately. Workman v. Mifflin, 30 Pa. 362 (1858).)

Edward L. Snitzer, *Pennsylvania Eminent Domain*, §201(2)-9 (1965). *See Pittsburgh Outdoor Advertising Corp. Appeal*, 440 Pa. 321, 272 A.2d 163 (1970); *Profit-Sharing Blue Stamp Co. v. Urban Redevelopment Authority*, 429 Pa. 396, 241 A.2d 116 (1968). I believe it to be clear, based upon the above cited authorities, that the loss of business income does not go to the issue of damages as such, because any award for damages to the tenant is based not on those grounds but upon different grounds, quite commonly referred to as "bonus" damages, as explained by Snitzer above.

It should also be understood, of course, that compensation to the tenant for business dislocation damages under §601A(b) of the Code, 26 P.S. §1-601A(b), is a separate item of damages specifically provided by the Code to tenants who lose their leases. Under §601A(b) of the Code, such a tenant is entitled to an award for the relocation of his personal property, or the value thereof if the personal property cannot be moved without diminishing its value, *and* an amount equal to forty times his actual monthly rental (up to $10,000) if his business cannot be successfully relocated without a substantial loss of existing patronage.

## II. TERMINOLOGY OF CONDEMNATION CLAUSE

The condemnee further waived his right to compensation by the terms of his lease with Exxon. Paragraph thirteen of the lease states:

13. CONDEMNATION. If the entire premises shall be taken by condemnation or sold to the condemning authority under threat thereof, this lease shall terminate on the date of such taking or sale. If a part only of the premises shall so be taken or sold, and the balance of the premises is not suitable for the operation of a retail drive-in automobile service station, either party may terminate this lease at any time within forty-five (45) days following such taking or sale without liability to the other party therefor. Any and all payments made for or arising from any such taking *or for* damages to the premises resulting therefrom shall belong and be payable solely to Exxon, except as otherwise provided by law. (Emphasis added.)

The trial court emphasized the term "premises" in its opinion with the result that the lease was read to assign payments to Exxon related only to the taking of the actual physical property and not to DiFurio's "leasehold interest."[4] Such an interpretation is directly contrary to the construction that our Supreme Court, in *Scholl's Appeal*, 292 Pa. 262, 141 A. 44 (1928), gave to a similar termination of condemnation provision. The *Scholl's* court held that a clause stating that the lease shall terminate as of the date title vested in the condemnor barred the tenant from

---

[4] I believe that the emphasis in the clause should be placed on the term "or." Read in such a manner, this provision would then provide that Exxon is entitled to payments both for or arising from the condemnation *and* for any damages to the premises as a result of the condemnation except as otherwise provided by law, *e.g.*, business dislocation damages specifically provided to tenants.

recovering for the loss of his leasehold interest. *See also* Snitzer, *Pennsylvania Eminent Domain* §201(2)-9 (the effect of such a clause is to bar lessee's right to damages for the loss of the unexpired leasehold term). The identical lease provision at issue here was also interpreted by the Appellate Division of the New Jersey Superior Court to preclude a lessee from sharing in condemnation damages. *See Jersey City Redevelopment Agency v. Exxon Corp.*, 208 N.J. Super. 53, 504 A.2d 1207 (App. Div. 1986).[5]

The majority attempts to distinguish *Scholl's Appeal* from the instant case by focusing on the actions of the condemnee and Exxon after the occurrence of the *alleged de facto taking,* and viewing that occurrence of the "taking" as terminating the written lease. However, even if this were true, the resultant tenancy-at-will would have, nonetheless, continued all of the terms and conditions of the written lease, including paragraph thirteen, unless changed by the parties by mutual agreement. Only the rental amount was changed by the parties, *see supra* n.3, however, and no evidence was introduced to show that paragraph 13 was in any way altered.

Finally, the majority construes Exxon's attempted enforcement of the termination clause as an attempt to realize a double recovery in that Exxon collected the tenant's rent during the period between the alleged *de facto* taking and the *de jure* taking, and now wants damages for the taking of his leasehold as well. However, Exxon's enforcement of the termination clause does not create a double recovery because as we have seen, damages to the tenant for the *de facto* taking would only arise if there was a difference between the fair rental value of the property and the rent the tenant was actually paying,

---

[5] *See also,* Kanev, *A Critical Analysis of Lease Form 50,* 53 Temple L.Q. 506, 553 (1980).

that is, the "bonus value" of the tenant's loss, and that, of course, would be for a period of nine months only. If the fair market value at the time of the taking (*i.e.* July 27, 1986) was greater than the rent paid by DiFurio, he would be receiving a "bonus" under the terms of the lease. This "bonus," projected over the remaining term of the lease (*i.e.*, nine months to April 14, 1987, the date a declaration was filed) and discounted to its present worth, would constitute the damages he is entitled to recover. As a matter of fact, DiFurio's rent was *increased* in September of 1986. *See supra* n.3. He would not, however, in any event, be entitled to damages based on lost business income. *Pittsburgh Outdoor Advertising Appeal; Iron City Automobile Co. v. City of Pittsburgh*, 253 Pa. 478, 98 A. 679 (1916); *Graham Realty Co. Appeal*, 67 Pa. Commonwealth Ct. 318, 447 A.2d 342 (1982). Other damages as the result of the taking, either *de jure* or *de facto*, would be compensable to the tenant under other sections of the Code and are not at issue here.