The WALDRON STREET BOOK COM-PANY, a Pennsylvania Corporation, d/b/a Bradley's Book Cellar, Appellant,

v.

CITY OF PITTSBURGH and Urban Redevelopment Authority of Pittsburgh.

Commonwealth Court of Pennsylvania.

Argued June 5, 2000.

Decided April 18, 2001.

Stuart M. Levine, Pittsburgh, for appellant.

Sharon M. O'Neill, Pittsburgh, for appellee, Urban Redevelopment Authority of Pittsburgh.

George R. Specter, Pittsburgh, for appellee, City of Pittsburgh.

Before SMITH, Judge, FLAHERTY, Judge, McCLOSKEY, Senior Judge.

FLAHERTY, Judge.

The Waldron Street Book Company, d/b/a Bradley's Book Cellar (Bradley's) appeals from an order of the Court of Common Pleas of Allegheny County (trial court) which sustained the preliminary objections filed by the City of Pittsburgh (City) and the Urban Redevelopment Authority of Pittsburgh (URA) in response to Bradley's petition under Section 502(e) of the Eminent Domain Code (Code), Act of June 22, 1964, Special Sess., P.L. 84, *as amended*, 26 P.S. § 1–502(e), for the appointment of viewers. We affirm.

In 1994, Bradley's entered into a lease for premises at 223 Fifth Avenue in the block between Wood and Market Streets in Pittsburgh, commencing February 1,

1995. Although the lease expired on January 31, 1998, Bradley's continues to occupy the space on a year-to-year basis. The premises are located in the Inner Triangle Study Area, certified as blighted by the Planning Commission (Commission) in accordance with the Urban Redevelopment Law, and designated as Redevelopment Area No. 54.

The facts in this case as determined by the trial court and not challenged on appeal are as follows. In March of 1997, two and one-half years after Bradley's opened for business, the City began a street renovation project known as the Fifth Avenue Project Phase II (Phase II) along several blocks of Fifth Avenue, including Bradley's block. Phase II consisted of installation of new water lines, elimination of vaults under sidewalks, new traffic signs and street lighting, and reconstruction of curbs and sidewalks. Smithfield Street and Liberty Avenue were closed to pedestrian and vehicular traffic from 8:30 p.m. to 4 a.m. Monday through Thursday, but they were never closed during daylight business hours. Pedestrians were able to walk down Fifth Avenue from Wood Street to Market Street on both sides of the street, although barricades and fences were erected for safety reasons. Access to all stores including Bradley's was maintained via the use of walkways to each storefront with handrails on both sides. Legal crosswalks were maintained and a hundred-foot loading zone lane was established to enable merchants to receive deliveries. During the renovations to Fifth Avenue, the URA imploded buildings on Fifth Avenue and Wood Street to make room for construction of the Lazarus department store. Renovations to Fifth Avenue were completed on October 31, 1998.

In addition to the Lazarus construction and street improvements, the City and URA were planning an upscale retail development known as The Marketplace at Fifth and Forbes (Marketplace). Reports indicated that the Marketplace would encompass Bradley's premises.

On March 25, 1998, Bradley's alleged a de facto taking and petitioned for the appointment of viewers. On April 6, 1998, a board of viewers was appointed. On April 24, 1998, the City and URA filed preliminary objections. The trial court thereafter sustained the preliminary objections and vacated the appointment of viewers. This appeal followed.

 One alleging a de facto taking, such as Bradley's, bears a heavy burden of proving that exceptional circumstances exist which substantially deprive one of the use of their property, and that the deprivation is the direct and necessary consequence of the actions of the entity having the power of eminent domain. *Petition of 1301 Filbert Limited Partnership for the Appointment of Viewers*, 64 Pa.Cmwlth. 605, 441 A.2d 1345 (1982). There is no bright line test to determine whether government action has resulted in a de facto taking. Each case must be decided on its own facts. *Id.*

 Because of the street improvements, the Lazarus construction and the new Marketplace, Bradley's alleges that it suffered a significant decline in sales. Bradley's maintains it suffered a fifty-percent loss in sales from 1996 to 1997. However, the facts in this case lead to the conclusion that sales only declined by five percent. Specifically, Bradley's federal income tax return for 1995 showed gross sales of $218,158. (R.R. 361a.) The 1996 tax return showed gross sales of $289,934. (R.R. 379a.) The 1997 federal income tax return showed gross sales of $339,717. (R.R. 396a.) This figure, however, also included sales from another store owned by Bradley's known as Bradley's Book Outlet. A document entitled Waldron

Street Book Company Income Statement as of December 31, 1997, showed that Bradley's gross sales for 1997 were $276,494. (R.R. 412a.)

As such, subtracting Bradley's 1997 gross sales of $276,494 from its 1996 gross sales of $289,934 results in a difference of $13,440 or a five percent decrease in gross sales between 1996 and 1997. Bradley's, in arguing that its sales declined by fifty percent, compared its December 1996 book sales of $40,000 to its June 1997 sales of $20,000. However, this does not accurately reflect Bradley's business because sales are historically slower in May and June (R.R. at 126a–128a, 335a–336a), and it was compared to Bradley's December 1996 sales, the only month in which Bradley's sales approached $40,000. A more accurate comparison of sales is year-to-year, and such a comparison shows that Bradley's sales declined by five percent, not fifty percent. As such, it cannot be argued that the street improvements, Lazarus construction and Marketplace project substantially affected Bradley's use of its property.

The only case relied on by Bradley in arguing that a de facto taking occurred is *Department of Transportation v. DiFurio*, 124 Pa.Cmwlth. 273, 555 A.2d 1379 (1989), *petition for allowance of appeal denied*, 524 Pa. 632, 574 A.2d 72 (1989). In that case, DiFurio operated a gas station under a lease from Exxon. The station, which was located on a corner, was situated in the path of Legislative Route 1010. The Department of Transportation (DOT) did not file a formal declaration of the property until April 14, 1987.

DiFurio, however, filed a petition for the appointment of viewers in August of 1986, asserting that pre-condemnation proceedings and twenty-five years of publicity concerning the new road deprived him of the use and enjoyment of his tenancy and sub-stantially interfered with his business. This court agreed with the trial court that exceptional circumstances existed which deprived DiFurio of the use and enjoyment of the premises and that such deprivation was the immediate consequence of the condemnee's power.

Specifically, this court observed that DOT did not formally condemn DiFurio's property "until nine months and three successive postponements after DOT's first ninety day notice of condemnation letter dated August 1, 1986 was sent." *Id.*, 555 A.2d at 1382. Moreover, without DiFurio's knowledge, an employee of DOT visited his premises and spoke to DiFurio's employees regarding the imminence of condemnation. As a result, six of DiFurio's twelve full-time employees quit. DiFurio was also unable to order gasoline in bulk quantity because he did not know how long his service station would be in existence. Many of DiFurio's customers refused to have their cars fixed at his station because they did not know how long he would be in business. Also, DiFurio lost two of his five commercial accounts and his "gasoline sales and repair business significantly declined after August of 1986." *Id.* This court then quoted from the trial court opinion which analyzed DiFurio's plight to a property owner "just waiting for the wrecking ball of societal improvement, at the hands of the Commonwealth, while the recipient of the blow trying to operate a sinking business despite having no idea of the time the wrecking ball will strike." *Id.*

Bradley's argues that following *DiFurio*, a new test should be adopted by this court to determine whether a de facto taking has occurred. Specifically, Bradley's argues a de facto taking occurs when:

1. The property owner is just waiting for the wrecking ball of societal improvement;

2. The wrecking ball is at the hands of the commonwealth;

3. The property owner, who is the recipient of the blow, is trying to operate a sinking business; and

4. The property owner has no idea of the time the wrecking ball will strike.

(Bradley's brief at p. 12.) (All capital letters deleted.)

Initially, we observe that *DiFurio* did not establish a new test, but instead determined that DiFurio had established exceptional circumstances which deprived DiFurio of the use of his premises and that the deprivation was the result of DOT's power. Moreover, the *DiFurio* property was the subject of a planned condemnation and the ultimate finding of a de facto taking was based on the adverse interim consequences suffered by DiFurio prior to the condemnation. This court observed that generally, the adverse interim consequences caused to the property owner by the prospect of condemnation will not constitute a de facto taking, *Conroy–Prugh Glass Co. v. Department of Transportation,* 456 Pa. 384, 321 A.2d 598 (1974). In *DiFurio,* however, this court determined that exceptional circumstances existed which deprived DiFurio of the use of his premises. Here, Bradley's has failed to show that it was deprived of the use of its premises.

Moreover, in contrast to *DiFurio,* there is no planned condemnation of Bradley's property. Specifically, as to the City's actions in repairing the sidewalks, such action did not occur as a result of the City exercising its power of eminent domain. Rather, all work was done within the public right-of-way and no condemnation of any property was required. As found by the trial court, at no time was Bradley's block completely closed to vehicular traffic during daylight hours and pedestrian access was always maintained. Moreover, even if Bradley's had been temporarily deprived of all access during street construction, the Code does not permit any award of damages for the temporary loss of access during construction. *Berk v. Department of Transportation,* 168 Pa. Cmwlth. 560, 651 A.2d 195 (1994), *petition for allowance of appeal denied,* 541 Pa. 628, 661 A.2d 875 (1995).

As to the URA, we agree with the trial court that its action in developing the Lazarus store and its involvement in the proposed Marketplace did not result in a de facto taking of Bradley's property. As to the Lazarus store, the trial court found that the demolition of existing buildings was required which caused inconvenience and dust for a small period of time of less than a month. Concerning the new Marketplace, the trial court found that no evidence was presented by Bradley's regarding the new retail, entertainment project except for newspaper articles. This is in contrast to *DiFurio,* where there had been twenty-five years of publicity concerning the new road and in fact DOT informed DiFurio that his property would be condemned as early as August 1, 1986, yet a formal declaration was not filed until April 14, 1987. It was in this interim period that DiFurio proved a de facto taking. Here, there is no planned condemnation of Bradley's property and Bradley's has not shown a deprivation of the use of its property.

Because Bradley's has not proved a de facto taking, in accordance with the above, the order of the trial court is affirmed.

## *ORDER*

Now, April 18, 2001, the order of the Court of Common Pleas of Allegheny County, at GD 98–5141, dated May 12, 1999, is affirmed.